# EXHIBIT A

# STATE OF NEW HAMPSHIRE
## DEPARTMENT OF STATE
## BUREAU OF SECURITIES REGULATION

IN THE MATTER OF:            )
                                    )  **ORDER TO CEASE AND DESIST,**

     **LPL Financial, LLC**         )  **ORDER TO SHOW CAUSE**
     **CRD #6413**               )
                                      )  **C-2013-000005**

     **Respondent**            )

## NOTICE OF ORDER

       This Order commences an adjudicative proceeding under the provisions of RSA 421-B:26-a.

## LEGAL AUTHORITY AND JURISDICTION

       Pursuant to RSA 421-B:23, the Secretary of State has the authority to issue and cause to be served an order requiring any person appearing to him to be engaged or about to be engaged in any act or practice constituting a violation of RSA 421-B or any rule or order thereunder, to cease and desist from violations of RSA 421-B.

       Pursuant to RSA 421-B:24, I, any person who willfully violates a cease and desist order issued pursuant to RSA 421-B:23 shall be guilty of a class B felony.

       Pursuant to RSA 321-B:10, III, the Secretary of State may issue an order requiring the person to whom any license has been granted to show cause why the license should not be revoked.

       Pursuant to RSA 421-B:26, the Secretary of State has the authority to impose administrative penalties of up to $2,500.00 for each violation of New Hampshire securities law and rules.

Pursuant to RSA 421-B:10,I the Secretary of State may by order deny, suspend, or revoke any license or application, or bar any person from licensure if he finds that the application or licensee has failed to reasonable supervise his agents if he is a broker-dealer.

## NOTICE OF RIGHT TO REQUEST A HEARING

The above named respondent has the right to request a hearing on this order to cease and desist, as well as the right to be represented by counsel. Any such request for a hearing shall be in writing, shall be signed by the respondent, or by the duly authorized agent of the above named respondent, and shall be delivered either by hand or certified mail, return receipt requested, to the Bureau of Securities Regulation, Department of State, 25 Capitol Street, Concord, New Hampshire 03301.

Under the provisions of RSA 421-B:23, I, if respondent fails to request a hearing on this order within 30 calendar days of receipt of this order, respondent shall be deemed in default, and this order to cease and desist shall, on the thirty-first day, become permanent.

Upon request for a hearing being received by the Bureau of Securities Regulation, in the manner and form indicated above, a hearing shall be held not later than ten days after such request is received by the Bureau, after which hearing, the Secretary of State, or such other person authorized by statute, shall issue a further order vacating or modifying this order, or making it permanent, as the circumstances require.

## STATEMENT OF ALLEGATIONS

The allegations contained in the Staff Petition for Relief dated April 6, 2015  (a copy of which is attached hereto) are incorporated by reference hereto.

## ORDER

**WHEREAS**, finding it necessary and appropriate and in the public interest, and for the protection of investors and consistent with the intent and purposes of the New Hampshire securities laws, and

**WHEREAS**, finding that the allegations contained in the Staff Petition, if proved true and correct, form the legal basis of the relief requested, therefore:

It is hereby **ORDERED**, that:

1. Respondent is hereby ordered to immediately cease and desist from the above indicated acts and from in any other way violating RSA 421-B;

2. Respondent shall show cause why its securities license in New Hampshire should not be revoked.

3. Respondent shall make an offer of rescission and/or pay restitution for all unlawful and unsuitable non-traded REIT sales to New Hampshire investors.

4. Respondent and its financial advisors shall disgorge themselves of all commissions or other remuneration received from the unlawful or unsuitable sale of non-traded REITs to New Hampshire investors.

5.  Respondent shall, in accordance with RSA 421-B:26,I,  pay an administrative fine up to One Million Dollars ($1,000,000).

6. The Respondent shall pay the Bureau's costs of  investigation and enforcement in the amount of $200,000.

7. Failure to request a hearing within 30 days of the date of receipt of this Order shall result in a default judgment being rendered and administrative penalties being imposed upon the defaulting Respondent.

SIGNED,
**WILLIAM M. GARDNER**
**SECRETARY OF STATE**
BY HIS DESIGNEE:

Dated: _April 6, 2015_

**BARRY J. GLENNON, DIRECTOR,**
**BUREAU OF SECURITIES REGULATION**

STATE OF NEW HAMPSHIRE
DEPARTMENT OF STATE
BUREAU OF SECURITIES REGULATION
25 CAPITOL STREET
CONCORD, NH 03301

**STAFF PETITION FOR RELIEF
IN THE MATTER OF:**

LPL Financial, LLC (CRD # 6413)

C-2013000005

I.  The Bureau of Securities Regulation, Department of State, State of New Hampshire
(hereinafter referred to as "the Bureau"), hereby petitions the Director, and makes the
following statement of facts:

**STATEMENT OF FACTS**

**Background**

1.  LPL Financial, LLC ("LPL"), is an investment advisor and broker-dealer with a
principal place of business at 75 State Street 24th Floor, Boston, Massachusetts 02109.
LPL has been licensed in New Hampshire since 1982 and has been licensed with the
Securities and Exchange Commission ("SEC") and with the Financial Industry
Regulatory Authority ("FINRA") since 1973.

2.  As part of their business, LPL financial advisors sell alternative investments ("AIs") to
their clients. AIs include products such as limited partnership interests, membership
interests in limited liability companies, hedge funds, managed futures, business trusts,
and real estate investment trusts ("REITs"). REITs can be further separated into two
distinct sub-categories, REITs that are traded on a national securities exchange and those
that are not. REITs that fall into this latter category are referred to as non-exchange
traded REITs, or non-traded REITs for short.

3.  Non-traded REITs have certain characteristics that differ from exchange-traded REITs.
The secondary market for non-traded REITs is very limited and redemption offers may
be priced below the purchase price. Second, the front-end fees associated with the sale
of non-traded REITs can be as high as 15% of the per share price and include selling
compensation and expenses. Finally, investors in non-traded REITs may seek income
from distributions over a period of years but distributions are not guaranteed and
whether distributions are paid is often within the sole discretion of the REIT's Board of
Directors.

1

4.  In the process of selling a non-traded REIT to clients, LPL financial advisors fill out a form titled Alternative Investment Purchase Approved Public Direct Participation Program ("AI1 form"). The AI1 form requires that the LPL financial advisor provide certain client financial information in order to determine whether the proposed sale would result in a concentration of AIs beyond specific caps established by LPL. (*See generally* Ex. 2 and Ex. 3.)

5.  LPL Written Supervisory Procedures ("WSPs") regarding AIs include guidelines for the sale of AIs in client accounts. (*See generally* Ex. 4.) Specifically, these guidelines outline the percentage of a client's liquid net worth ("LNW") that may be invested in AIs ("AI Concentration"). (*Id.* at 1–2.) As Exhibit 4 shows, determining what AI Concentration is appropriate for a particular client depends on several different factors including: 1) the client's age at the time of investment; 2) the client's LNW at the time of investment; and 3) the client's investment objective. (*Id.*) Further, both charts in Exhibit 4 establish a percentage cap on the concentration of a client's LNW in any one asset category (e.g. Public Real Estate LPs, REITs, Oil and Gas, Equipment Leasing, etc.). (*Id.*)

6.  LPL's WSPs related to AIs state that "LPL Financial considers liquid net worth to include all assets that can be liquidated within thirty (30) days, exclusive of real estate holdings" and that "[t]he liquid net worth reported on the new account form should include the assets being used to fund the LPL Financial account but should exclude any existing alternative investment holdings." (*Id.* at 2.) However, the AI1 form states that the charts included in the form are to be used to determine the "[m]aximum percentage of Liquid Net Worth (after the purchase) that can be invested in alternative investments according to the client's investment objective (unless otherwise specified by the prospectus)." (Ex. 2 at 2.)

### The Bureau's Investigation

7.  The complainant in this matter is an eighty-one (81) year-old New Hampshire resident who was sold a non-traded REIT by LPL in January of 2008. The aggregate amount of the complainant's investment was $253,000 although her investment in the REIT sold was paid in two (2) tranches. The complainant's LNW, as stated in the AI1 form related to her investment was $2.5 million. As the complainant was over seventy (70) years old at the time of her investment, according to the AI1 form completed, the maximum AI Concentration was 10%.After reviewing the complaint in this matter, the Bureau initiated an investigation of LPL. As part of its investigation, the Bureau sent several document requests to LPL seeking information about non-traded REIT sales to New Hampshire investors back to 2007.

8.  Specifically, on September 27, 2013 the Bureau sent a document request to LPL seeking a list of all non-traded REIT sales to New Hampshire investors for a specified period. In response to the Bureau's request, LPL provided a spreadsheet of every non-traded REIT sale to New Hampshire investors since 2007 including the date of the sale, the product sold, the amount of the sale, the client's name, the net worth and liquid net worth of the client, the client's investment objective, the client's investment horizon, as well as other information pertaining to the sale.

9.  Upon review of the information provided by LPL in response to the Bureau's September 27, 2013 request, the Bureau requested additional information from LPL. Based on the documents produced by LPL, the Bureau ultimately determined that LPL had made numerous sales of non-traded REITs to New Hampshire investors that violated New Hampshire securities law and LPL's guidelines on AI Concentration.

10. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the Bureau sent several subsequent requests to LPL seeking all documentation supporting LPL's assertions. One of the Bureau's requests included all AI1 forms underlying each non-traded REIT sale in New Hampshire from 2007 to the date of the request.

11. In reviewing the documentation provided by LPL in response to the Bureau's subsequent requests, including all AI1 forms related to each non-traded REIT sale in New Hampshire since 2007, the Bureau determined that LPL not only violated its own WSPs and AI Concentration caps on numerous occasions, but also that LPL's WSPs and supervisory systems as they relate to the sale of non-traded REITs were systematically flawed resulting in hundreds of unlawful or unsuitable non-traded REIT sales to New Hampshire investors.

### Inconsistencies in LPL's WSPs and Forms Related toNon-traded REIT Sales to New Hampshire Investors

12. As mentioned above, LPL has WSPs specific to AIs. (*See generally* Ex. 4.) As part of these WSPs, LPL provides guidance as to the suitability of certain AI sales based on certain client information. (*Id.* at 1–2.) This client information includes: 1) the client's age at the time of investment; 2) the client's LNW at the time of investment; and 3) the client's investment objective. (*Id.*) Based on these three pieces of information, LPL has established specific caps on the AI Concentration in client accounts.

Clients under 70 years old

| Investment Objective | Liquid net worth up to $999,999 | Liquid net worth between $1.0M to $4.9M | Liquid net worth above $5.0M | Asset Categories (capped at 20%) |
|---|---|---|---|---|
| Income with Capital Preservation | 0% | 0% | 15% | Public Real Estate LP's, REIT's, Oil & Gas and Equipment Leasing |
| Income with Moderate Growth | 20% | 20% | 25% | |
| Growth with Income | 20% | 25% | 30% | |
| Growth | 20% | 25% | 30% | |
| Aggressive Growth | 20% | 25% | 35% | |

No more than 20% in any one asset category for clients with up to $10MM, those with $10MM or above may hold up to 25% in any one asset category.

Clients 70 years old and above

| Investment Objective | Liquid net worth up to $999,999 | Liquid net worth between $1.0M to $4.9M | Liquid net worth above $5.0M | Asset Categories (capped at 15%) |
|---|---|---|---|---|
| Income with Capital Preservation | 0% | 0% | 5% | Public Real Estate LP's, REIT's, Oil & Gas and Equipment Leasing |
| Income with Moderate Growth | 10% | 10% | 12% | |
| Growth with Income | 10% | 12% | 15% | |
| Growth | 10% | 12% | 15% | |
| Aggressive Growth | 10% | 15% | 15% | |

No more than 15% in any one asset category.

No more than 10% of client's LNW can be invested in programs treated as a business development company.

LPL Financial reserves the right to review any transaction, and will do so when appropriate, especially in cases where investors are of significantly advanced age (i.e. 85 and above)

Note: Prospectus requirements supersede these guidelines where applicable.

**Fig. 1:** Excerpt from Exhibit 4, pg. 1 and 2.

13. As Exhibit 4 also demonstrates, the percentage of a client's LNW that may be invested in a specific asset category of AIs is also capped. (*Id.*) As shown in Exhibit 4, for clients under seventy (70) years old, no more than 20% or 25% of a client's LNW may be invested in REITs, depending on the client's LNW. For clients over seventy (70) years old, this cap is 15% regardless of the client's LNW.

14. LPL's WSPs and their caps on AI Concentration have been updated since 2007 but the general structure has remained the same. A client's permitted AI Concentration is based on the client's age, LNW, and investment objective.

15. In order to effectuate these guidelines, LPL created the AI1 form described above. (*See generally* Ex. 2 and Ex. 3.) The AI1 form itself, in addition to other information, requires the LPL financial advisor input the client's LNW, net worth ("NW"), annual income, and the amount of the proposed purchase. (Ex. 2 at 2.)

16. The AI1 form also requires that the LPL financial advisor input whether the client has current or pending AI holdings, the name of the products held, and the amount invested in each product. (*Id.*)

17. The AI1 form then requires the LPL financial advisor to perform basic arithmetic to determine whether the proposed sale is within LPL's established caps on AI Concentration. The formula for this arithmetic is as follows:

> Add your current Alternative Investment holdings (item f) to the amount of your purchase (item e), then divide by your liquid Net Worth (item a) to

4

determine the percentage of Liquid Net Worth in Alternative Investments after this purchase ([f + e]/a).  (*Id.*)

18. Thus, based on the information provided in Exhibit 2 and the formula on the AI1 form, the calculation would be completed as follows:

$$\frac{\$27,000 \text{ (current/pending holdings)} + \$10,000 \text{ (current purchase)}}{\$250,000 \text{ (LNW)}}$$

In this case, the resulting percentage would be 14.8%.[1]

19. The LPL financial advisor completing this form would then compare the percentage resulting from the calculation above against the charts provided in the AI1 form.

**LPL's Alternative Investment Approval Guidelines**

Maximum percentage of liquid net worth (after the purchase) that can be invested in each product type according to the client's investment objective (unless otherwise specified in the prospectus)

Clients under 70 years old

| Investment Objective | Liquid net worth up to $299,999 | Liquid net worth between $1.0M to $4.9M | Liquid net worth above $5.0M | Asset Categories (capped at 20%) |
|---|---|---|---|---|
| Income with Capital Preservation | 0% | 0% | 10% | Public Real Estate LP's, REIT's, Oil & Gas and Equipment Leasing |
| Income with Moderate Growth | 20% | 20% | 25% | |
| Growth with Income | 20% | 25% | 30% | |
| Growth | 20% | 25% | 30% | |
| Aggressive Growth | 25% | 30% | 35% | |

No more than 20% in any one asset category for clients with up to $10MM, those with $10MM or above may hold up to 25% in any one asset category

**LPL's Alternative Investment Approval Guidelines** (continued)

Clients 70 years old and above

| Investment Objective | Liquid net worth up to $299,999 | Liquid net worth between $1.0M to $4.9M | Liquid net worth above $5.0M | Asset Categories (capped at 15%) |
|---|---|---|---|---|
| Income with Capital Preservation | 0% | 0% | 5% | Public Real Estate LP's, REIT's, Oil & Gas and Equipment Leasing |
| Income with Moderate Growth | 10% | 10% | 12% | |
| Growth with Income | 10% | 12% | 15% | |
| Growth | 10% | 12% | 15% | |
| Aggressive Growth | 10% | 15% | 15% | |

No more than 15% in any one asset category

No more than 10% of client's LNW can be invested in programs treated as a business development company

LPL Financial reserves the right to review any transaction, and will do so when appropriate, especially in cases where investors are of significantly advanced age (i.e. 85 and above)

Note: Prospectus requirements supersede these guidelines where applicable

Fig. 2: Excerpt from Exhibit 2, an AI1 form, showing LPL's established caps on AI Concentration.

Since the client in related to Exhibit 2 is fifty-four (54) years old, with an investment objective of Growth, and a LNW of $250,000, the client's LNW percentage cap would be 20%.  Thus, the resulting 14.8% AI Concentration would not exceed LPL's

---

[1]  The account opening documents for this client are included in Exhibit 1 attached hereto.  It should be noted that at the time of the account's creation, the client's LNW was reported as "[b]etween $100,000 and $249,999."  This is consistent with the LNW reported on both Exhibit 2 and Exhibit 3 attached hereto and indicates that prior AI sales were included in the client's LNW at the time of these REIT sales considering the LNW in both Exhibit 2 and Exhibit 3 is $250,000.

established caps on AI Concentration based on the client's specific financial information.

20. Exhibit 3 is the AI1 form used in a subsequent sale to the same client as Exhibit 2. (*See generally* Ex. 3.) Based on the information reported in Exhibit 3 and the instructions on the AI1 form, the calculation of the resulting AI Concentration would be calculated as follows:

$$\frac{\$39,250 \text{ (current/pending holdings)} + \$7,500 \text{ (current purchase)}}{\$250,000 \text{ (LNW)}}$$

In this case, the client's resulting AI Concentration would be 18.7%. The LPL financial advisor completing this form would then compare the percentage resulting from the calculation above to the charts provided in the AI1 form. Since the client in Exhibit 3 is fifty-four (54) years old, with an investment objective of Growth and a LNW of $250,000, the client's AI Concentration cap would be 20%. Thus, the resulting 18.7% AI Concentration would not exceed LPL's established guidelines based on the client's specific financial information.

21. However, WSPs provide the following regarding the suitability and required disclosures in the sale of AIs:

> Advisors are required to make a full and fair disclosure of all material facts pertaining to alternative investments they solicit or sell. This may include, among other things, disclosing that the alternative investment generally is illiquid and the customer may not be able to liquidate or sell the securities in the future. Advisors are also required to verify, at the time of purchase, that the customer meets all suitability requirements specifically provided in the prospectus or offering memorandum for such security (e.g., minimum annual income and net worth, state regulations, etc). As a reminder, LPL Financial considers liquid net worth to include all assets that can be liquidated within thirty (30) days, exclusive of real estate holdings. This includes, but is not limited to: checking and savings accounts, IRA and, all marketable securities, commodity accounts, cash, money market funds and precious metals. The liquid net worth reported on the new account form should include the assets being used to fund the LPL Financial account but should exclude any existing alternative investment holdings. (Ex. 4 at 2.)

22. LPL's WSPs highlight the effect the illiquidity of AIs such as REITs have on the calculation of LNW. (*Id.*) According to the WSPs, at the time an account is opened, "the assets being used to fund the LPL Financial account" should be included in LNW on account opening forms since, at that time, those assets are liquid. (*Id.*) However, the WSPs go on to state that LNW should "exclude any existing alternative investment

6

holdings" since these holdings are often considered illiquid and thus should not be considered part of a client's LNW. (*Id.*)

23. The language of LPL's WSPs described above is problematic in the effectuation of AI sales mainly because the LNW calculation outlined within the WSPs, determining what is and is not included in LNW, is inconsistent with how a client's AI Concentration is calculated using the AI1 form.

24. Based on the charts provided in the AI1 form, as pictured above, LPL financial advisors should determine the "[m]aximum percentage of Liquid Net Worth (*after the purchase*) that can be invested in alternative investments according to the client's investment objective (unless otherwise provided by the prospectus)." (Ex. 3 at 2.) (emphasis added). Thus, if LNW "should exclude any existing alternative investment holdings" based on the fact that such holdings are illiquid, and the AI Concentration should use the client's LNW after the purchase has been made, then, based on Exhibit 3, the resulting AI Concentration should be calculated as follows:

$$\frac{\$39,250 \text{ (current/pending holdings)} + \$7,500 \text{ (current purchase)}}{\$250,000 \text{ (starting LNW)} - \$46,750 \text{ (current purchase/current holdings)}}$$

This calculation would result in an AI Concentration "after the purchase" of 23.0%. In this case, this resulting percentage would exceed LPL's guidelines based on the client's specific financial information. In reviewing Exhibit 3 it is clear that the financial advisor completing the AI1 form did not exclude the current purchase or the current holdings from the client's LNW as reported. (Ex. 2 at 2, Ex. 3 at 3.) This is especially clear when comparing the NW and LNW as reported in Exhibit 2 and Exhibit 3 as these numbers do not change from one exhibit to the other. (Ex. 2 at 2, Ex. 3 at 3.) This is inconsistent with LPL's WSPs regarding what should be included in LNW as well as the language and guidance included on the AI1 form. In this case, even if LPL did not require that the LNW of the client be reduced by amount of the current purchase, the resulting AI Concentration would be calculated as follows:

$$\frac{\$39,250 \text{ (current/pending holdings)} + \$7,500 \text{ (current purchase)}}{\$250,000 \text{ (starting LNW)} - \$39,250 \text{ (current holdings)}}$$

This calculation would result in an AI Concentration of 22.18%, still in excess of LPL's established cap on AI Concentration for this client, set at 20%.

25. Based on LPL's WSPs and the language of the AI1 form, the LNW used in determining the permissible AI Concentration for a client after the purchase *must* exclude the amount of the current purchase and any current AI holdings. (Ex. 2 at 2, Ex. 3 at 3, Ex. 4 at 2.) As such, the NW and LNW reported on the AI1 form *must* be different by at least the

amount of the current purchase and any current AI holdings.  If the amount of the current purchase or current AI holdings is not excluded from the LNW as reported on the AI1 form, the resulting AI Concentration will be artificially low and thus incorrect.

26. If a non-traded REIT sale is executed based on an artificially low AI Concentration, as demonstrated by Exhibit 3 attached hereto and the examples above, then the LPL financial advisor making the sale and any supervisory personnel reviewing and authorizing the sale would not have a reasonable basis to believe the transaction in question was suitable.  Based on the lack of a reasonable basis for suitability, the only reasonable inference is that such sales were unlawful and unsuitable.  Thus, the burden rests with LPL to show that all non-traded REIT sales made to New Hampshire investors based on artificially low AI Concentrations were, in fact, lawful and suitable.

27. Additionally, when a non-traded REIT sale is executed based on clearly erroneous financial information such as an identical NW and LNW, as demonstrated by Exhibit 2 and Exhibit 3 attached hereto, the LPL financial advisor completing the form and any supervisory personnel reviewing or authorizing the sale would not have a reasonable basis to believe that the proposed sale was suitable.  Based on the lack of a reasonable basis for suitability, the only reasonable inference is that such sales were unlawful and unsuitable.  Thus, the burden rests with LPL to show that all non-traded REIT sales made to New Hampshire investors based on clearly erroneous AI1 forms were, in fact, lawful and suitable.

28. In 376 instances LPL sold non-traded REITs to New Hampshire investors based on clearly erroneous AI1 forms or artificially low AI Concentrations.  These 376 sales totaled approximately $17.5 million.

29. Further, based on the Bureau's review of the AI1 forms for all non-traded REIT sales in New Hampshire back to 2007, the Bureau determined that approximately forty-eight (48) non-traded REITs of the 376 sales made to New Hampshire investors resulted in an AI Concentration that blatantly exceeded LPL guidelines.  These forty-eight (48) unlawful and unsuitable sales totaled approximately $2.4 million.

30. These forty-eight (48) unsuitable and unlawful sales included at least eighteen (18) sales that were executed based on AI forms that clearly indicated the sale violated LPL AI Concentration caps.  For example, in one instance, the AI1 form clearly stated that the client's AI Concentration after the purchase would be 14.6%.  However, as this client was over 70 years old with an investment objective of "Growth with Income" and a LNW of less than $1 million, the applicable AI Concentration cap was 10%.  In another instance, a husband and wife were each sold REITs based on a joint LNW.  In the aggregate, factoring in current AI holdings, these two REIT sales caused the couple's joint AI Concentration to exceed the applicable 20% cap.  Finally, in another instance, a

client was sold a $100,000 non-traded REIT with no other prior or pending AI purchases. As this client was over 70 years old with an investment objective of "Growth with Income" and a liquid net worth of $800,000 the AI Concentration for this client after the purchase was 12.5%, exceeding the applicable 10% AI Concentration cap. The LPL financial advisor completing the AI1 form for this sale erroneously stated that the AI Concentration after the sale would be 8%.

31. It should be noted that these forty-eight (48) unlawful and unsuitable sales include the sale to the complainant. Because the complainant's LNW was reported as $2.5 million and the sale to the complainant resulted in an AI holding of $253,000, the complainant's resulting AI Concentration exceeded the applicable 10% cap. Thus, LPL's sale to the complainant was unlawful and unsuitable.

32. Finally, for the 376 non-traded REIT sales to New Hampshire investors based on clearly erroneous AI1 forms or artificially low AI Concentrations, the LPL financial advisors responsible for those sales as well as LPL received approximately $1 million in aggregate gross commissions.

### LPL's Deficient Supervisory Review of Non-traded REIT Sales

33. During the course of the Bureau's investigation, LPL had, generally, a three-tier supervisory system for reviewing and processing AI transactions including the sale of non-traded REITs. Each AI transaction generated by an LPL financial advisor was first reviewed by an Office of Supervisory Jurisdiction Manager ("OSJ Manager", i.e., the registered representative's branch office manager). (Ex. 4 at 1.) After the initial review by the OSJ Manager, the AI transaction was then processed by the Alternative Investment Operations Department ("AI Ops"). (*Id.*) If AI Ops flagged the AI transaction for additional review, the transaction was then reviewed by either LPL's Surveillance Department, or LPL's Designated Principals (depending on the time period in question). (*Id.*)

34. During the course of the Bureau's investigation, the AI1 forms provided by LPL to the Bureau were processed and reviewed by at least two tiers of LPL supervisors, an OSJ Manager and personnel in AI Ops. (*See id.*)

35. As demonstrated by Exhibit 2 and Exhibit 3 attached hereto, the AI1 forms used in the execution of non-traded REIT sales in New Hampshire, from 2007 through 2012, contained various red flags that LPL supervisory personnel either did not recognize or did not find problematic enough to remedy. In fact, in approximately 376 instances, non-traded REITs were sold to New Hampshire investors based on AI1 forms that contained one or more of these red flags.

9

36. In approximately 269 of the 376 instances described above, AI1 forms utilized in non-traded REIT sales to New Hampshire investors listed the client's NW and LNW as the same amount. This red flag indicates that in these instances the proposed purchase was not being deducted from the client's LNW, in direct violation of LPL's WSPs and AI1 form instructions.

37. In approximately ninety-three (93) instances, AI1 forms listed the same LNW as was listed on the AI1 forms for a prior purchase by the same client. This red flag indicates that in these instances the proposed purchase was not being deducted from the client's LNW, in direct violation of LPL's WSPs and AI1 form instructions.

38. In approximately thirty-four (34) instances, AI1 forms listed the client's NW and LNW as different amounts, but the difference was less than the amount of the proposed purchase, any other pending purchases, and all prior AI purchases. This red flag indicates that in these instances the proposed, pending, and prior purchases were not being deducted from the client's LNW, in direct violation of LPL's WSPs and AI1 form instructions.

39. Finally, in approximately forty-eight (48) instances, LPL financial advisors sold non-traded REITs to New Hampshire investors that violated LPL's established AI Concentration caps. In eighteen (18) of these forty-eight (48) instances, the AI1 form clearly demonstrated that the proposed sale would violate LPL's caps on AI Concentration. In the remaining thirty (30) of these forty-eight (48) instances, the AI1 form contained one or more of the red flags described above. In all of these forty-eight (48) instances, the AI1 form was reviewed by LPL supervisory personnel and the proposed sale was executed despite its unsuitability.

40. In every one of the 376 instances described above, each tier of LPL's supervisory review process either did not recognize the red flags present or, if these red flags were recognized, simply failed to resolve them. Additionally, in each of the 376 instances described above, a non-traded REIT was sold to a New Hampshire investor regardless of the red flags present in the accompanying AI1 forms.

41. In certain circumstances, LPL's supervisory system did reject and return AI1 forms to LPL financial advisors. This occasionally occurred when the client's AI Concentration, as written on the AI1 form, clearly exceeded the caps on AI Concentration established by LPL. On these occasions, when the form was returned by LPL supervisory personnel, LPL financial advisors would typically increase the LNW as listed on the form in an amount sufficient to lower the client's AI Concentration below the caps established by LPL. These forms were then resubmitted to LPL supervisory personnel and were sent to the sponsor for execution with no further alteration.

**LPL's Deficient Supervisory Systems for Non-traded REIT Sales**

42. In addition to LPL's faulty three-tier supervisory review process, LPL utilized a database to catalogue the information captured in the AI1 forms. This database was utilized in producing initial non-traded REIT sales information to the Bureau as part of its investigation.

43. Upon review of the initial non-traded REIT sales information provided to the Bureau, the Bureau determined that, for certain sales, the LNW of the client exceeded the client's NW. This is clearly problematic as LNW is a subset of NW and cannot under any circumstances exceed NW as only a portion of a client's NW is liquid. This error occurred in approximately 428 instances among the total 950 non-traded REIT sales provided.

44. As the non-traded REIT sales information initially produced to the Bureau by LPL was clearly erroneous, at least one of several inferences can be made. First, if this information was incorrectly entered into the database manually, then the LPL personnel entering the information were negligent. Second, if the information was incorrectly entered into the database as part of some automated process, then the automated process employed was faulty. Third, even if the sales information was entered into the database correctly but some logic within the database caused certain sales information to be altered rendering the sales information inaccurate, LPL's system for maintenance of such information was defective. Finally, even if non-traded REIT sales information was entered into and maintained within LPL's database correctly but the information was altered in the process of producing information to the Bureau, then LPL's processes for production of past sales information is flawed.

45. Regardless of the cause of the inaccurate sales information produced to the Bureau by LPL, the information produced was nonetheless inaccurate. The inaccuracy of the sales information produced to the Bureau is concerning primarily because such information is not only important to a regulatory inquiry regarding the suitability of certain non-traded REIT sales, as is the case here, but such information is also essential to any internal review of LPL's processes and procedures regarding the sale of such products. The fact that inaccurate sales information was entered into, maintained within, or distributed from any database under LPL's control represents a considerable supervisory failure on the part of LPL.

## STATEMENTS OF LAW

II. The Bureau hereby petitions the Director and makes the following statements of law under the New Hampshire Revised Statutes Annotated, N.H. RSA 421-B, and regulations thereunder:

1. LPL is a "broker-dealer" and a "person" within the meaning of N.H. RSA 421-B:2, III and XVI.

2. LPL financial advisors are "agents" and "persons" within the meaning of N.H. RSA 421-B:2, II and XVI.

3. The non-traded REITs at issue here are "securities" within the meaning of N.H. RSA 421-B:2, XX.

4. The sale of non-traded REITs as described herein constitute "sales" within the meaning of N.H. RSA 421-B:2, XIX.

5. Pursuant to N.H. RSA 421-B:3-a, in recommending to a customer the purchase, sale, or exchange of a security, a broker-dealer or broker-dealer agent must have reasonable grounds for believing that the recommendation is suitable for the customer upon the basis of the facts, if any, disclosed by the customer after reasonable inquiry as to his or her other security holdings and as to his or her financial situation and needs. LPL is subject to this provision yet sold 376 non-traded REITs to New Hampshire residents based on erroneous information regarding the customer's financial status. Further, in forty-eight (48) instances LPL sold non-traded REITs that violated their own guidelines relating to the sale of AIs. These forty-eight (48) instances resulted in the sale of approximately $2.4 million worth of unlawful and unsuitable non-traded REITs to New Hampshire investors. Pursuant to N.H. RSA 421-B:8, X, persons licensed under N.H. RSA 421-B shall abide by the rules of the Securities and Exchange Commission, National Association of Securities Dealers (now FINRA), national and regional stock exchanges, and other self-regulating organizations which have jurisdiction over the licensee, which set forth standards of conduct in the securities industry. LPL is subject to this provision.

6. Pursuant to FINRA Rule 3110(a), each FINRA member shall establish and maintain a system to supervise the activities of each associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules. LPL is subject to this rule yet failed to establish and maintain a system to supervise the activities of its financial advisors when it maintained and disseminated inaccurate non-traded REIT sales information in response to requests for such information from the Bureau. Further, LPL failed to establish and maintain a system to supervise the activities of its financial advisors when it permitted 376 non-traded REIT sales to occur based on clearly erroneous AI1 forms despite a three-tier supervisory review process. Each violation of FINRA Rule 3110(a) is a violation of N.H. RSA 421-B:8, X.

12

7. Pursuant to FINRA Rule 3110(b)(1), each member shall establish, maintain, and enforce written procedures to supervise the types of business in which it engages and the activities of its associated persons that are reasonably designed to achieve compliance with applicable securities laws and regulations. LPL failed to enforce their written supervisory procedures when they allowed forty-eight (48) sales to be made in excess of their guidelines. Further, LPL failed to enforce their WSPs when they allowed 376 non-traded REIT sales to occur based on clearly erroneous AI1 forms despite a documented three-tier supervisory review process. Each violation of FINRA Rule 3110(b)(1) is also a violation of N.H. RSA 421-B:8, X.

8. Pursuant to N.H. RSA 421-B:10, I, the Secretary of State may by order deny, suspend, or revoke any license or application, or bar any person from licensure if he finds that the applicant or licensee has failed to reasonably supervise his agents if he is a broker-dealer. Pursuant to N.H. RSA 421-B:10, VI, in addition to any such order to suspend or revoke any license or application, the Secretary of State may, upon hearing, assess an administrative fine of not more than $2,500 per violation. LPL is subject to this provision and failed to reasonably supervise its agents as evidenced by the fact that LPL's supervisory system failed to recognize and remedy hundreds of erroneous AI1 forms. Further, LPL failed to reasonably supervise its agents when it failed to maintain accurate non-traded REIT sales information. Finally, LPL failed to reasonably supervise its agents when it failed to enforce its own WSPs in relation to non-traded REIT sales to New Hampshire investors including when it forwarded on for execution AI1 forms containing inaccurate client financial information.

9. Pursuant to N.H. RSA 421-B:10, III, the Secretary of State may issue an order requiring the person to whom any license has been granted to show cause why the license should not be revoked. The order shall be calculated to give reasonable notice of the time and place for the revocation hearing, and shall state the reasons for the issuance of the order. LPL is subject to this provision and should be ordered to show cause why its securities licensure in New Hampshire should not be revoked.

10. Pursuant to N.H. RSA 421-B:22, in any investigation to determine whether any person has violated or is about to violate this title or any rule or order under this title, upon the Secretary of State's prevailing at hearing, or the person charged with the violation being found in default, or pursuant to a consent order issued by the Secretary of State, the Secretary of State shall be entitled to recover the costs of the investigation, and any related proceedings, including reasonable attorney's fees, in addition to any other penalty provided for under N.H. RSA 421-B. LPL is subject to this provision and should be ordered to pay the Bureau's costs of investigation and enforcement of this matter.

11. Pursuant to N.H. RSA 421-B:23, I, whenever it appears to the Secretary of State that any person has engaged or is about to engage in any act or practice constituting a violation of this chapter or any rule or order under N.H. RSA 421-B, the Secretary of State shall have the power to issue and cause to be served upon such person an order requiring the person to cease and desist from violations of N.H. RSA 421-B. LPL is subject to this provision and should be ordered to cease and desist from further violations of N.H. RSA 421-B.

12. Pursuant to N.H. RSA 421-B:26, III, any person who violates a provision of the chapter may be subject to an administrative fine not to exceed $2,500, with each act constituting a separate violation. LPL is subject to this provision and should be ordered to pay an administrative fine for each violation of N.H. RSA 421-B outlined herein.

13. Pursuant to N.H. RSA 421-B:26, V, after notice and hearing, the Secretary of State may enter an order of rescission, restitution, or disgorgement directed to a person who has violated N.H. RSA 421-B, or a rule or order thereunder. Rescission, restitution or disgorgement shall be in addition to any other penalty provided for under N.H. RSA 421-B. LPL is subject to this provision and should be ordered to offer rescission for any unlawful or unsuitable non-traded REIT sale to a New Hampshire investor. Further, LPL should be ordered to pay restitution for any unlawful or unsuitable non-traded REIT sale to a New Hampshire investor where such investors no longer hold the position. Finally, any commission received by LPL or any LPL agent related to the unlawful or unsuitable sale of a non-traded REIT to a New Hampshire investor should be disgorged.

## **RELIEF REQUESTED**

III. The Bureau makes the following requests for relief in the above-referenced matter as permitted under N.H. RSA 421-B:

1. Find as fact the statements contained in Section I, the Statement of Facts.

2. Make conclusions of law relative to the statements contained in Section II, the Statements of Law.

3. Pursuant to N.H. RSA 421-B:23, order that LPL immediately cease and desist from further violations of N.H. RSA 421-B.

4. Pursuant to N.H. RSA 421-B:10, III order that LPL show cause why its securities licensure in New Hampshire should not be revoked.

5. Pursuant to N.H. RSA 421-B:26, V and VI, order LPL to make an offer of rescission or pay restitution for all unlawful and unsuitable non-traded REIT sales to New Hampshire investors.

14

6. Pursuant to N.H. RSA 421-B:26, V, order LPL and its financial advisors to disgorge all commissions or other remunerations received from the unlawful or unsuitable sale of non-traded REITs to New Hampshire investors.

7. Pursuant to N.H. RSA 421-B:26, I, order LPL to pay an administrative fine of up to One Million Dollars ($1,000,000).

8. Pursuant to N.H. RSA 421-B:22, IV, order that LPL pay the Bureau's costs of investigation and enforcement in the amount of Two Hundred Thousand Dollars ($200,000).

## **RIGHT TO AMEND**

The Bureau staff reserves the right to amend this Petition for Relief and to request that the Director of the Bureau take additional administrative action. Nothing herein shall preclude the Staff from bringing additional enforcement action under this N.H. RSA 421-B or the regulations thereunder.

Respectfully submitted by:

_____          ___4__/_6__/_15___
Adrian S. LaRochelle, Staff Attorney           Date

_____          ___4_/6/15___
Eric A. Forcier, Staff Attorney                Date

_____          ___4/6/15___
Jeffrey D. Spill, Deputy Director              Date

15

Exhibit 1

**NA**

# LPL Financial    **New Account Application and Agreement**

Instructions  Not to be used for advisory accounts  Fax the completed form to Brokerage New Accounts at (858) 546-0874

**ATTENTION CLIENT: Any alterations must be initialed by all clients.**

| LPL Account Number | Rep ID | Date Opened | This application is for |
|---|---|---|---|
| 44718459 | MN4C | | ● A new account   ○ An existing account* |
| | | MM / DD / YYYY | |

☑ Select for direct business account

☐ Select for direct advisory account (print name of Platform or Program) **
(Refer to the detailed procedures for the specific types of direct advisory
accounts on the Resource Center for other documents that are required.)

*For existing accounts, do NOT use this form to change legal name, investment objective, and/or financial information. To change
legal name, use the Brokerage Account Change Form (F401).  To change investment objective or financial information, use
BranchNet | Change Account.

** For direct advisory accounts LPL is not acting as the broker/dealer and your account will be custodied at a third party custodian.

## Section I: Account Information

**1.** Fill in your current residency status: (choose one)      Country of Citizenship/Registration

● U.S. Citizen   ○ Resident Alien   ○ Non-Resident Alien

**2.** Registration Type:

● Individual                          ○ Personal Trust*              ○ Partnership*
○ Joint Tenants With Rights Of Survivorship   ○ IRA/SEP/SIMPLE*          ○ Investment Club*
○ Tenants in Common                   ○ Qualified Retirement Plan/403(b)(7)*   ○ Guardianship/Conservatorship*
○ Tenants by Entirety                 ○ Corporate*                  ○ Estate*
○ Community Property                  ○ Limited Liability Company*  ○ Other (Please specify below)*
○ Custodian for Minor                 ○ Non-Profit Organization*

*Additional documents required

**3.** Account Registration

**4.** Substitute W9

Social Security Number or Tax ID Number or Employer Identification Number

**5.** Mailing Address

Residence Address (no P.O. boxes) ☐ Same as mailing address

| Home Phone | Business Phone | Fax Number | Email |
|---|---|---|---|



**NA**

LPL Account Number [ 44718459 ]

## Section II: Account Holder Information

For corporate, LLC, non-profit organization, partnership, and investment club accounts, this section is NOT required  Please complete the appropriate supplementary documentation instead. For additional account holders, please complete the Supplemental Account Application (F1C)

**1.**

**Primary Account Holder/Trustee/Minor/Decedent**

**Social Security Number**

**Residence Address (no P.O. boxes)** ☐ Same as account

**Date of Birth**
MM / DD / YYYY

**# Dependents**

**Country of Citizenship**
UNITED STATES

**ID Type**
Driver License

**Place of Issuance**
New Hampshire

**ID Number**

**ID Issuance Date**
MM / DD / YYYY

**ID Expiration Date**
MM / DD / YYYY

**Occupation** (former occupation if retired)

**Nature of Business**

**Home Phone**

**Employer Name** ☐ (mark here if retired or unemployed)

**Business Phone**

**Employment Address (no P.O. boxes)**

**Has the client ID been verified?** ● Yes ○ No

☐ Mark here if you are an employee of or related to an employee of any exchange or member firm of any exchange or member of the FINRA or officer of a bank, trust company, or insurance company, then complete the following

**Name** [ ]   **Relationship** [ ]   **Name of Firm** [ ]

☐ Mark here if you or any member of your immediate family has been a corporate officer, director, or owner of 10% or more of any public corporation within the past three months, then complete the following

**Name of Corporation(s)** [ ]

**2.**

**Secondary Account Holder/Trustee/Custodian/Fiduciary**

**Social Security Number**

**Residence Address (no P.O. boxes)** ☐ Same as account

**Date of Birth**
MM / DD / YYYY

**# Dependents**

**Country of Citizenship**

**ID Type**

**Place of Issuance**

**ID Number**

**ID Issuance Date**
MM / DD / YYYY

**ID Expiration Date**
MM / DD / YYYY

**Occupation** (former occupation if retired)

**Nature of Business**

**Home Phone**

**Employer Name** ☐ (mark here if retired or unemployed)

**Business Phone**

**Employment Address (no P.O. boxes)**

**Has the client ID been verified?** ○ Yes ○ No

☐ Mark here if you are an employee of or related to an employee of any exchange or member firm of any exchange or member of the FINRA or officer of a bank, trust company, or insurance company, then complete the following

**Name** [ ]   **Relationship** [ ]   **Name of Firm** [ ]

☐ Mark here if you or any member of your immediate family has been a corporate officer, director, or owner of 10% or more of any public corporation within the past three months, then complete the following

**Name of Corporation(s)** [ ]

**NA**

LPL Account Number  44718459

## Section III: Margin Agreement

A margin account allows you to borrow against eligible securities or purchase securities on margin. Initial below if you want to establish a margin account and to indicate that you have received the Margin Disclosure Statement and have read the margin disclosure section in the Master Account Agreement and agree to the terms and conditions. **Please note:** ALL parties must initial.

Date Margin Disclosure Statement provided

| | | | |
|---|---|---|---|
| MM / DD / YYYY | Initials | Initials | Initials | Initials |

## Section IV: Investment Objective

**1.** **Select the investment objective that most accurately reflects the goals for this account** (choose only one)
The investment objectives are overall objectives for the entire account and may be inconsistent with a particular holding at any time. Please note that achievement of the stated investment objectives is a long-term goal for the account.

○ **A. Income with Capital Preservation.** Designed as a longer term accumulation account, this is the most conservative investment objective. Emphasis is placed on generation of current income and prevention of capital loss.

○ **B. Income with Moderate Growth.** Emphasis is placed on generation of current income with a secondary focus on moderate capital.

○ **C. Growth with Income.** Emphasis is placed on modest capital growth with some focus on generation of current income.

● **D. Growth.** Emphasis is placed on achieving high long-term growth and capital appreciation. There is little focus on generation of current income.

○ **E. Aggressive Growth.** Emphasis is placed on aggressive growth and maximum capital appreciation. No focus on generation of current income. This objective has a very high level of risk and is for investors with a longer time horizon.

○ **F. Trading.** Emphasis is placed on speculative transaction activity. This objective represents acceptance of an extremely high level of risk.

**ATTENTION CLIENT:** If you select an objective and cross it out to choose another, you must initial next to this change.

## Section V: Financial Information and Experience

**1  What is your total annual income?**

○ A. Less than $25,000     ○ B. Between $25,000 and $49,999     ○ C. Between $50,000 and $99,999
● D. Between $100,000 and $249,999     ○ E. Between $250,000 and $499,999     ○ F. Between $500,000 and $749,999
○ G. Between $750,000 and $999,999     ○ H. $1,000,000 and over

**2.  What is your net worth?** (exclusive of home)

○ A. Less than $25,000     ○ B. Between $25,000 and $49,999     ○ C. Between $50,000 and $99,999
● D. Between $100,000 and $249,999     ○ E. Between $250,000 and $499,999     ○ F. Between $500,000 and $749,999
○ G. Between $750,000 and $999,999     ○ H. $1,000,000 and over

**3.  What is your liquid net worth?**

○ A. Less than $25,000     ○ B. Between $25,000 and $49,999     ○ C. Between $50,000 and $99,999
● D. Between $100,000 and $249,999     ○ E. Between $250,000 and $499,999     ○ F. Between $500,000 and $749,999
○ G. Between $750,000 and $999,999     ○ H. $1,000,000 and over

**4.  Approximate account value?**

● A. Less than $25,000     ○ B. Between $25,000 and $49,999     ○ C. Between $50,000 and $99,999
○ D. Between $100,000 and $249,999     ○ E. Between $250,000 and $499,999     ○ F. Between $500,000 and $749,999
○ G. Between $750,000 and $999,999     ○ H. $1,000,000 and over

**5.  What is your federal tax bracket?**

28  %

**6.  Investment Experience** (number of years):

| | | |
|---|---|---|
| _____ None | _____ Margin | 10 Stocks | _____ Options |
| 10 Mutual Funds | _____ Annuities | 10 Bonds | _____ Partnerships |
| _____ Other (please specify) _____ | | |

**7.  Source of Client Wealth and Income** (inheritance, employment salary, sale of real estate, etc.)

Employment Income

**NA**

LPL Account Number    44718459

## Section VI: Client Acknowledgment and Execution

Under penalties of perjury, I hereby certify that (1) The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. person (including a U.S. resident alien). (Cross out (2) if subject to backup withholding.) **The Internal Revenue Service does not require my consent to any provision of this document other than the certifications required to avoid backup withholding.**

I understand that LPL will supply my name to issuers of any securities held in my account so that I may receive important information regarding those securities, unless I notify LPL in writing not to do so.

**I understand and agree that it is my responsibility to inform my financial advisor any time I purchase class A shares of a mutual fund in the same fund family as a fund that I own, either individually or in related accounts, in order to ensure that I receive the appropriate commission discount.**

**I acknowledge that proceeds from liquefied home equity on my primary residence will not be used to fund this account.**

**I further certify that all of the information provided on this form is true, correct, and complete and that I have received a copy of this form. I agree to notify LPL of any changes to the information on this form. I have reviewed and accept the Master Account Agreement and the predispute arbitration clause stated in the last section thereof.**

| | | | |
|---|---|---|---|
| _____ | _6-3-10_ | _____ | _____ |
| Client Signature (if tenant in common, indicate % of ownership) | Date | Client Signature (if tenant in common, indicate % of ownership) | Date |

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| Client Signature (if tenant in common, indicate % of ownership) | Date | Client Signature (if tenant in common, indicate % of ownership) | Date |

**BRANCH USE ONLY**

I have reviewed this document for completeness, accuracy, suitability, and proper disclosures. If this account was opened online and the automated check against the OFAC list of specially designated nationals (SDNs) resulted in a match to the client's name, I have confirmed that the client is not the same person listed by OFAC. If this account is opened by the home office, I have checked the list of SDNs and either the client's name does not appear or, if the client's name is the same as the name of a SDN, the client is not the person listed by OFAC. I have also provided the client with the CIP disclosure either in writing or verbally.

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| Financial Advisor Signature (unless same as Branch Manager) | Financial Advisor Name (print) | Rep ID | Date |

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| Joint Financial Advisor Signature (optional) | Joint Financial Advisor Name (print) | Rep ID | Date |

| | | | |
|---|---|---|---|
| _Jeffrey N. Williams_ | JEFFREY N WILLIAMS | MN4C | _6/3/10_ |
| Branch Manager Signature (required) | Branch Manager Name (print) | Rep ID | Date |

Exhibit 2

**APD**

# LPL Financial

## Alternative Investment Purchase
## Approved Public Direct Participation Program

**Instructions**: Use this form to request LPL's approval prior to investing in approved public direct participation programs, such as public equipment leasing programs, public oil & gas limited partnerships, public real estate limited partnerships, tax credit limited partnerships or registered non-traded investment programs. (Please refer to the Resource Center for the most current list of available investments.) For each prospective investment, complete this form and the sponsor's subscription agreement in their entirety and send originals to Alternative Investment Processing, P.O. Box 509053, San Diego, CA 92150-9053 or overnight to 9785 Towne Centre Drive, San Diego, CA 92121

**Please note: This form is not to be used for private offerings, including 1031 exchanges, exchange funds, hedge funds (or funds of hedge funds), managed futures, or private equities.**

| 1. | **Client Information** (The account registration listed below must match the new account paperwork on file with LPL. A new outside investment account does not need to be opened if a brokerage account already exists for the same registration.) |
|---|---|

| **LPL Account Number (REQUIRED)** | **Rep ID** |
|---|---|
| 44718459 | MN4C |

| **Client Name/Account Registration** | **Date of Birth** |
|---|---|
| ▬▬▬▬▬▬▬▬ | ▬▬▬▬▬▬ |

| **Joint Client Name** (if applicable) | **Date of Birth** |
|---|---|
| | |

| 2. | **Product Information** (all fields required) |
|---|---|

| **Investment Product Name** | **Product Sponsor Name** |
|---|---|
| Cole Credit Property Trust III, INC | Cole |

| **Date of Prospectus*** | **Date Prospectus Delivered to Client** |
|---|---|
| April 30, 2010 | March 9, 2011 |

*MUST BE CURRENT PROSPECTUS

| 3. | **Account Information** (must select one) |
|---|---|

Indicate where this alternative investment will be held

◯ Held in the above listed LPL-sponsored brokerage retirement account. A $50 purchase fee will be deducted from the account.

◉ Held directly with the sponsor or with the sponsor's approved third-party retirement custodian (must be an LPL non-retirement or outside investment account). If applicable, please include the third-party retirement custodian's enrollment and funding documents if the investment is being held with the sponsor's approved retirement custodian

| 4. | **4a. Source of Funds** (must select one) |
|---|---|

◯ Yes  ◉ No  Original source of funds for this purchase was from a full or partial liquidation of a prospectus product (e.g. mutual fund, variable annuity, variable universal life, 529 plan, non traded REIT, managed futures, etc.) If yes, a completed and signed *Investment Switch/Exchange Disclosure* form (F27) must be attached (not needed if source of fund is from LPL advisory account).

**4b. Funding Instructions** (must select one)

☐ Issue a check from the referenced account number for the amount of $_____ (Write specific dollar amount) Funds are currently available for the purchase and applicable fees. Please note: Funds must be available in the account. (e.g. trades must be settled or a journal/transfer of funds has already occurred **Not available for qualified outside investment account**).

☐ Issue a check from a different LPL account _____ for the amount of $_____ (Write specific dollar amount) If the authorized signers are different from those listed on the purchasing account, their signatures are required below **(not available for LPL-sponsored retirement accounts or qualified outside investment account).**

_____     _____
Authorized Signer Signature            Authorized Signer Name (print)

_____     _____
Authorized Signer Signature            Authorized Signer Name (print)

☑ Send enclosed check payable to the product sponsor (or product sponsor's bank/escrow agent) for the amount of $_____. (Write specific dollar amount) **Not available for LPL Sponsored Retirement Accounts.**

Funding Instructions continue on next page

**APD**

**Funding Instructions** (Third Party Retirement Custodian)

☐ Investment will be held at the product sponsor's approved third party retirement custodian, AND:

OR

☐ Account transfer paperwork is included to transfer funds to the third party retirement custodian (This may increase time for investment to be completed due to transfer request being submitted back to LPL from third party retirement custodian after LPL approval)

☐ A contribution check made payable to the third party retirement custodian is enclosed.

☐ Funds have been issued from a third party and have been sent directly to the fund sponsor (not available for LPL-sponsored retirement accounts).

---

**5. Financial Information**

Complete this section to determine if your alternative investment purchase meets LPL's Alternative Investment Approval Guidelines (see below)

**Please note:** The financial information provided below must match the client's financial information on record with LPL. If the client's financial information needs to be updated, please provide the correct information on this form and LPL will update its records accordingly

**a. Liquid net worth***

| 250,000 |

*LPL defines liquid net worth as all assets that can be liquidated in 30 days, exclusive of real estate holdings. This includes, but is not limited to, the following: checking and savings accounts, retirement accounts, all marketable securities, commodity accounts, cash, cash equivalents, and precious metals

**b. Net worth**

| 250,000 |

**c. Net worth as defined by prospectus** (if different from item b above)

| |

**d. Annual income**

| 130,000 |

**e. Amount of your purchase**

| 10,000 |

**f. Current or pending alternative investment holdings:**
Client is currently invested in alternative investments.

◉ Yes (If yes, please list current and pending holdings below)
○ No

| Name | Dollar Amount Currently Invested | Pending |
|------|----------------------------------|---------|
| Healthcare Trust of America | 12,000 | ☐ |
| Cole | 5000 | ☐ |
| Behringer Harvard | 10,000 | ☑ |
| | | ☐ |
| Total dollar amount currently invested in alternative investments. | 27,000 | ($0 if none) |

**g.** Add your current alternative investment holdings (item f) to the amount of your purchase (item e), then divide by your liquid net worth (item a) to determine the percentage of liquid net worth in alternative investments after this purchase ([f + e]/a).

| 37,000 |

---

**LPL's Alternative Investment Approval Guidelines**

Maximum percentage of liquid net worth (after the purchase) that can be invested in each product type according to the client's investment objective (unless otherwise specified by the prospectus)

**Clients under 70 years old**

| Investment Objective | Liquid net worth up to $999,999 | Liquid net worth between $1.0M to $4.9M | Liquid net worth above $5.0M | Asset Categories (capped at 20%) |
|---------------------|--------------------------------|----------------------------------------|------------------------------|----------------------------------|
| Income with Capital Preservation | 0% | 0% | 10% | Public Real Estate LP's, REIT's, Oil & Gas and Equipment Leasing |
| Income with Moderate Growth | 20% | 20% | 25% | |
| Growth with Income | 20% | 25% | 30% | |
| Growth | 20% | 25% | 30% | |
| Aggressive Growth | 25% | 30% | 35% | |

No more than 20% in any one asset category for clients with up to $10MM, those with $10MM or above may hold up to 25% in any one asset category.

**LPL's Alternative Investment Approval Guidelines** (continued)

**Clients 70 years old and above**

| Investment Objective | Liquid net worth up to $999,999 | Liquid net worth between $1.0M to $4.9M | Liquid net worth above $5.0M | Asset Categories (capped at 15%) |
|---|---|---|---|---|
| Income with Capital Preservation | 0% | 0% | 5% | Public Real Estate LP's, REIT's, Oil & Gas and Equipment Leasing |
| Income with Moderate Growth | 10% | 10% | 12% | |
| Growth with Income | 10% | 12% | 15% | |
| Growth | 10% | 12% | 15% | |
| Aggressive Growth | 10% | 15% | 15% | |

No more than 15% in any one asset category

No more than 10% of client's LNW can be invested in programs treated as a business development company

LPL Financial reserves the right to review any transaction, and will do so when appropriate, especially in cases where investors are of significantly advanced age (i.e. 85 and above)

Note: Prospectus requirements supersede these guidelines where applicable.

---

| 6. | **Client Signature & Certification** (required) |
|---|---|

- I hereby acknowledge receipt of the prospectus and all of its terms and conditions.
- I understand that it is my responsibility to read the prospectus and all other offering materials prepared by the investment sponsor thoroughly and to understand them prior to investing
- I am aware of previous programs offered by the program sponsor (as indicated in section 2 of this form), if any, and whether or not they liquidated on or during the date or time period disclosed in the prospectus(es) for those programs. If no date or time period was disclosed in the prospectus(es), my advisor has informed me of this fact.
- I also understand this investment may be illiquid and that there may not be a readily available market for the investment. I understand that when a market exists, LPL may not be able to assist with the sale of such investments.
- I agree to pay the annual Alternative Investment Administration Fee of $35.00 per position, subject to a maximum of $100.00 per year if being held in an LPL account. These fees are in addition to fees that are charged by the general partner / transfer agent
- I agree to pay a $50.00 Alternative Investment Processing Fee per position for the purchase or re-registration of an alternative investment being held in an LPL account. Re-registrations include transfer-in requests, transfer-out requests, redemptions, and the distribution of an alternative investment.
- I certify that I understand that Unrelated Business Tax Income (UBTI) may be assessed to the account and that LPL will charge a fee of $100.00 for this service if required to file UBTI taxes, if this investment is being held in an LPL account
- If this is an LPL-sponsored retirement account, I understand that in the event that the issuer fails to deliver a certificate or confirmation to LPL within the SEC-required thirty days, this disbursement will be irrevocably reported to the IRS as a distribution
- In consideration of the foregoing, I agree to indemnify and hold harmless LPL and any person controlling or under common control with it from and against any cost, liability, or expense arising out of or connected with such investment
- I certify that all of the information provided on this form is true, correct, and complete, including my liquid net worth, net worth, and annual income. If the financial information provided on this form differs from that on record at LPL, I hereby authorize LPL to update its records with the financial information provided

For real estate programs that include multifamily assets, I understand:

- This type of investment may make investments through joint ventures. Investments in joint ventures that own real estate development projects and real properties may involve risks otherwise not present when programs purchase real properties directly. For example, the program's joint venture partner may file for bankruptcy protection, breach a loan agreement, have economic or business interests or goals that are inconsistent with its interests or goals or take actions contrary to the program's instructions, requests, policies or objectives.
- This type of investment may invest in mezzanine loans which involve greater risks of loss than senior loans secured by income-producing real properties because the investment may become unsecured as a result of foreclosure by the senior lender. Additionally, the program may invest in bridge loans secured by first lien mortgages on a multifamily property which involve greater risks of loss than conventional mortgage loans
- This type of investment may have a high level of indebtedness. High levels of indebtedness increase the risk of the investment and could hinder the ability of the sponsor to pay distributions to its stockholders or could decrease the value of the investment in the event that the income on or the value of the assets securing the debt falls
- The multifamily or apartment community industry is highly competitive. Competition from other apartment communities and the increased affordability of single-family homes could limit the sponsor's ability to retain current or attract new residents and maintain or increase rents, which could adversely affect the program's profitability and returns to its stockholders.
- This type of investment expects to have little cash flow from operating activities available for distribution until the sponsor makes substantial investments. To the extent its investments are in development or redevelopment projects or in properties that have significant capital requirements, their ability to make distributions may be negatively impacted, especially during its early periods of operation
- The investment strategy may result in a finding by the Internal Revenue Service that the sponsor has engaged in one or more "prohibited transactions" under provisions of the Internal Revenue Code related to dispositions of properties deemed to be inventory or otherwise held for sale in the ordinary course of their business.
- Until the proceeds from this offering are invested and generating cash flow from operating activities, some or all of our distributions will be paid from other sources, which may be deemed a return of capital, such as from the proceeds of this offering, cash advances by our advisor, cash resulting from a waiver of asset management fees and borrowings in anticipation of future cash flow from operating activities.
- Depending on the program's investment strategy, this type of investment may not qualify or remain qualified as a real estate investment trust ("REIT") for federal tax purposes, which would subject the sponsor to the payment of tax on its income at corporate rates and reduce the amount of funds available for payment of distributions to its stockholders

**APD**

**Client Signature & Certification** (continued)

For non-traded investment programs registered under the Investment Company Act of 1940, I understand:

- These types of programs are treated as business development company, or BDC, under the Investment Company Act of 1940 ("the 1940 Act.")  As such, these programs are required to comply with certain regulatory requirements.  The BDC structure limits the amount of leverage the firm can use, and the types of securities that may be leveraged

- BDCs make investments in private or thinly-traded public companies in the form of long-term debt or equity capital

- The program must invest a sufficient portion of its assets in qualifying assets which could preclude the firm from investing in accordance with its current business strategy, conversely, the failure to invest a sufficient portion of its assets in qualifying assets could result in its failure to maintain BDC status.  For detailed information on qualifying assets, please refer to the prospectus

- Failure to maintain status as a BDC would reduce the firm's operating flexibility. If the firm does not remain a BDC, it might be regulated as a closed-end investment company under the 1940 Act, which would subject the firm to substantially more regulatory restrictions under the 1940 Act and correspondingly decrease its operating flexibility

- Regulations governing the firm's operation as a BDC and Regulated Investment Company ("RIC") will affect its ability to raise, and the way in which they raise additional capital or borrow for investment purposes, which may have a negative effect on its growth.  If the firm does not pay out 90% of it taxable income, the BDC will not qualify as a RIC and all income would be taxed as income and capital gains to its shareholders

- The firm generally will not control its portfolio companies. Due to the lack of liquidity for its investments in non-traded companies, they may not be able to dispose of its interests in its portfolio companies as readily as the firm would like or at an appropriate valuation. As a result, a portfolio company may make decisions that could decrease the value of its portfolio holdings

- An investment strategy focused primarily on privately held companies presents certain challenges, including the lack of available information about these companies

- The firm will be subject to corporate-level income tax if they are unable to qualify as a RIC under Subchapter M of the Code or to satisfy RIC distribution requirements.
   - To maintain RIC tax treatment under the Code, the firm must, among other requirements, meet certain source-of-income and asset diversification requirements  In addition, the firm must pay out 90% of its taxable income, or the BDC will not qualify as a RIC and all income would be taxed as income and capital gains to shareholders

- No more than 10% of my liquid net worth can be invested in these types of programs

For other risk considerations, please make sure to read the prospectus thoroughly

|  | 03/23/2011 |
|---|---|
| Client Signature | Date |

| | |
|---|---|
| Joint Client Signature (if applicable) | Date |

BRANCH USE ONLY

**Financial Advisor Signature and Validation** (required)
- I certify that the client meets the product suitability requirements.
- My customer(s) is/are well known to me, and I validate that the signature(s) on the attached document is/are genuine  I agree for myself and my successors, assigns, heirs, executors, and administrators to at all times indemnify and hold harmless LPL and all LPL staff and third-party providers, acting as authorized agents of LPL, from and against any and all claims, losses, liabilities, taxes, damages, actions, charges, and expenses, including attorney fees, resulting from your compliance with this request. LPL reserves the right to verify the authenticity of any signature

| Financial Advisor Signature | Financial Advisor Name (print) | Rep ID | Date |
|---|---|---|---|
| Joint Financial Advisor Signature (if applicable)* | Joint Financial Advisor Name (print) | Rep ID | Date |
| Branch Manager Signature (required) | Jeffrey N Williams | MN4C | 03/23/2011 |
| *Optional  If split rep ID, all financial advisors sign. | Branch Manager Name (print) | Rep ID | Date |

**AI1-0510**

# Exhibit 3

# ◤ LPL Financial          **Alternative Investment Purchase**

**Instructions**: Use this form to request LPL's approval prior to investing in Approved Alternative Investment Programs, such as managed futures, hedge funds, equipment leasing programs, oil & gas limited partnerships, real estate limited partnerships, tax credit limited partnerships or registered non-traded investment programs. (Please refer to the Resource Center for the most current list of approved products.) For each prospective investment, complete this form and the sponsor's subscription agreement in their entirety and overnight originals to LPL Financial ('LPL'), Attn: Alternative Investments, 9785 Towne Centre Drive, San Diego, CA 92121

**Please note: This form is not to be used for 1031 Exchanges, Exchange Fund, Private Equities, Unsolicited Private Transactions**

| 1. | **Type of Asset  (REQUIRED. Check the box that describes the asset you are submitting for purchase. One form per purchase)** | |
|---|---|---|
| | ☑ Real Estate *(APO)* | ☐ Hedge Fund/Fund of Hedge Fund *(AHF)* |
| | ☐ Oil & Gas *(APO)* | ☐ Business Development Company *(ABDC)* |
| | ☐ Equipment Leasing *(APO)* | ☐ Managed Futures *(AMF)* |

**2.**

**Client Information (The account registration listed below must match the new account paperwork on file with LPL. A new outside investment account does not need to be opened if a brokerage account already exists with the same registration.)**

| **LPL Account Number (REQUIRED)** | **Rep ID** |
|---|---|
| 4471-8459 | MN4C |

| **Client Name/Account Registration** | **Date of Birth** |
|---|---|
| ▮▮▮▮▮▮▮▮▮▮▮▮▮ | ▮▮▮▮▮▮ |

| **Joint Client Name** (if applicable) | **Date of Birth** |
|---|---|
| ▮▮▮▮▮▮▮ | |

**3.**

**Product Information (ALL FIELDS REQUIRED)**

| **Investment Product Name** | **Product Sponsor Name** |
|---|---|
| Cole Credit Property Trust III | Cole Real Estate Investments |

| **Date of Prospectus*** | **Date Prospectus Delivered to Client**** |
|---|---|
| May 2, 2011 | January 18, 2012 |
| *Check with sponsor to ensure most current version | **Date must be post Date of Prospectus |

**4.**

**Account Information (MUST SELECT ONE)**

○ Select if purchasing an advisory approved product. These must be held in a fee based, qualified or non-qualified, advisory account at LPL

○ Select if purchasing in a qualified brokerage IRA. Position will be held in a LPL sponsored retirement account. A $50 purchase fee will be deducted from the account. **Cannot be held in a non-qualified brokerage or outside investment account.**

⦿ Select if purchasing a position to be held directly with the sponsor or with the sponsor's approved third-party retirement custodian (must be an LPL non-retirement or outside investment account)  If applicable, please include the third party retirement custodian's enrollment and funding documents if the investment is being held with the sponsor's approved retirement custodian (if using a third party custodian make sure section 6a and/or 6b is filled out)

**5a.**

**Source of Funds (REQUIRED)**

1. Is the original source of funds for this purchase coming     ○ Yes   ⦿ No     If Yes, go to question 2. If No, skip to section 6
   from a full or partial liquidation of a prospectus product
   (e.g. mutual fund, variable annuity, variable universal life,
   529 plan, non-traded REIT, managed future, etc.)?

2. Is the original source of funds for this purchase being     ○ Yes   ⦿ No     If Yes, skip to section 6. If No, complete section 5b
   liquidated from an advisory account?

**5b.** **Investment Switch/Exchange Disclosure (Unless indicated "If applicable" all sections MUST be filled in)**

**Name of Investment to be Liquidated**

**Specific Product Type to be Liquidated** (e.g. MF, VA, 529, Non-traded REIT, or any other Alternative Investment, etc.)
List multiple products if necessary

| **Type of Liquidation** (select one) | **Symbol (if applicable)** | **Year Purchased** | **Amount Being Liquidated** |
|---|---|---|---|
| ○ Full      ○ Partial | | | $ |

Indicate the total amount of any and all surrender charges, redemption fees, and/or other costs associated with liquidation/surrender that the client will incur:

| **Amount** | **Percentage of Investment Value** | **This investment exchange was: (MUST SELECT ONE)** |
|---|---|---|
| $ | % | ○ Unsolicited     ○ Solicited |

**If applicable, client will lose a death benefit of approximately** $

**Was this product sold by you, the financial advisor?**  ○ Yes   ○ No

**Reason for Exchange of Investment [SECTION NEEDS TO BE FILLED IN]**
Describe why this replacement transaction is appropriate for the client. Your explanation should discuss the specific advantages and disadvantages of the exchange and conclude in an evaluation of the overall net investment advantage to the client.

---

**6.** **Funding Instructions (Select all that apply. Funding amounts should equal purchase amount in section 7d as well as subscription agreement.)**

☐ Issue a check from the referenced account number for the amount of $ _____ (Write specific dollar amount.) Funds are currently available for the purchase and applicable fees. **Please note: Funds must be available in the account (e.g. trades must be settled or a journal/transfer of funds has already occurred. Not available for qualified outside investment account).**

☑ Enclosed is a personal client check made payable to the product sponsor for product sponsor's bank/escrow agent) for the amount of $ 7500 . (Write specific dollar amount). **Not available for LPL sponsored retirement accounts.**

☐ Issue a check from a different LPL account _____ for the amount of $ _____ . (Write specific dollar amount) If the authorized signers are different from those listed on the purchasing account, their signatures are required below (not available for LPL sponsored retirement accounts or qualified outside investment accounts).

---

Client Signature                    Client Name (print)                    Date

**For Third Party Retirement Custodian ONLY**

a ☐ Investment will be held at the product sponsor's approved third party retirement custodian, AND

  ☐ Account transfer paperwork is included to transfer funds to the third party retirement custodian. This may increase time for investment to be completed due to transfer request being submitted back to LPL from third party retirement custodian after LPL approval

  OR

  ☐ A contribution check made payable to the third party retirement custodian is enclosed

b ☐ Funds have been issued from a third party and have been sent directly to the fund sponsor or retirement custodian (not available for LPL sponsored retirement accounts)

**7.** **Financial Information (Section must be completed in its entirety. Additional documentation may be requested.)**
**Please note:** The financial information provided below must match the client's financial information on record with LPL. If the client's financial information needs to be updated, please provide the correct information on this form and LPL will update its records accordingly

**a. Liquid Net Worth\* (DOLLAR AMOUNT ONLY; RANGES WILL NOT BE ACCEPTED)**

250,000

\*LPL defines Liquid Net Worth as all assets that can be liquidated in 30 days, exclusive of real estate holdings. This includes, but is not limited to, the following: checking and savings accounts, retirement accounts, all marketable securities, commodity accounts, cash, cash equivalents, and precious metals.

**b. Net Worth (exclusive of primary residence, home furnishings, and automobiles. DOLLAR AMOUNT ONLY; RANGES WILL NOT BE ACCEPTED)**

250,000

**c. Annual Income (DOLLAR AMOUNT ONLY; RANGES WILL NOT BE ACCEPTED)**

150,000

**d. Amount of Purchase (MUST MATCH SUBSCRIPTION AGREEMENT)**

7,500

**e. Current or Pending Alternative Investment Holdings:**
Does this client currently hold, or are they in the process of purchasing, any additional Alternative Investments?

○ No   ◉ Yes (If yes, list current and pending holdings below  **DO NOT** include the purchase on this form Joint accounts must combine holdings.)

| Name | Dollar Amount Currently Invested | Pending |
|------|----------------------------------|---------|
| Cole | $ 16,087 | ☐ |
| HTA | $ 13,163 | ☐ |
| BehringerHarvard | $ 10,000 | ☐ |
|  | $ | ☐ |
|  | $ | ☐ |
| Total dollar amount currently invested in Alternative Investments | $ 39,250 | ($0 if none) |

**f. Add your current Alternative Investment holdings (item e) to the amount of your purchase (item d), then divide by your Liquid Net Worth (item a) to determine the percentage of Liquid Net Worth in Alternative Investments after this purchase ([e + d]/a).**

18 7      %   (MUST NOT EXCEED LPL GUIDELINES BELOW)

---

**LPL's Alternative Investment Approval Guidelines**

Maximum percentage of Liquid Net Worth (after the purchase) that can be invested in each product type according to the client's investment objective (unless otherwise specified by the prospectus)

**Clients UNDER 70 years old**

| Investment Objective | Liquid Net Worth up to $999,999 | Liquid Net Worth between $1.0M to $4.9M | Liquid Net Worth above $5.0M | Asset Categories |
|---|---|---|---|---|
| Income with Capital Preservation | 0% | 0% | 10% | |
| Income with Moderate Growth | 20% | 20% | 25% | No more than 20% in any one asset category and no more than 10% allowed in a BDC |
| Growth with Income | 20% | 25% | 30% | |
| Growth | 20% | 25% | 30% | |
| Aggressive Growth | 25% | 30% | 35% | |

**Clients 70 years old AND ABOVE**

| Investment Objective | Liquid Net Worth up to $999,999 | Liquid Net Worth between $1.0M to $4.9M | Liquid Net Worth above $5.0M | Asset Categories |
|---|---|---|---|---|
| Income with Capital Preservation | 0% | 0% | 5% | |
| Income with Moderate Growth | 10% | 10% | 12% | No more than 15% in any one asset category and no more than 10% allowed in a BDC |
| Growth with Income | 10% | 12% | 15% | |
| Growth | 10% | 12% | 15% | |
| Aggressive Growth | 10% | 15% | 15% | |

Note: Prospectus requirements supersede these guidelines where applicable

| 8. | **Client Signature & Certification (REQUIRED)** |
|---|---|

- I hereby acknowledge receipt of the prospectus and all of its terms and conditions
- I have read and understand the prospectus and all other offering materials prepared by the investment sponsor thoroughly and to understand them prior to investing
- I agree to pay the annual Alternative Investments Administration Fee of $35.00 per position, subject to a maximum of $100.00 per year if being held in a LPL account.
- I agree to pay a $50.00 Alternative Investment Processing Fee per position for the purchase or re-registration of an Alternative Investment being held in a LPL account. Re-registrations include transfer-in requests, transfer-out requests, redemptions, and the distribution of an Alternative Investment.
- I certify that I understand that Unrelated Business Tax Income (UBTI) may be assessed to the account and that LPL will charge a fee of $100 for this service if required to file UBTI taxes, if this investment is being held in a LPL account.
- In consideration of the foregoing, I agree to indemnify and hold harmless LPL and any person controlling or under common control with it from and against any cost, liability, or expense arising out of or connected with such investment.
- I certify that all of the information provided on this form is true, correct, and complete, including my Liquid Net Worth, Net Worth, and Annual Income
- I have had the opportunity to discuss with my advisor any questions regarding the risks of investing in this product and information presented to me about this product.

| _____ | _____ | 1-18-12 |
|---|---|---|
| Client Signature | Joint Client Signature | Date |

| 9. | **Product Specific Investor Representation (Owner MUST initial, sign, and date the type of product they are intending to purchase. If purchasing a private offering make sure section 10 is completed as well.)** |
|---|---|

**Real Estate (including REITs, Real Estate LPs, and LLCs)**

Client Initials _____   Joint Client Initials _____

- I understand that the current distribution yield, if any, is not guaranteed, and that this is not a "fixed income" product. Dividends and distributions may be reduced, paid out in stock instead of cash, or even ceased altogether, depending on the financial health of the REIT. I can withstand such an event and I am not relying on the income stream, if any, to meet my cash needs for the foreseeable future.
- I understand that the shares may be re-priced in the future, at a lower amount than what I purchased them for, depending on the value fluctuations of the underlying real estate properties. This is not a fixed price asset. I understand that leverage, especially floating rate, and debt subject to balloon payments, increase the likelihood of property level foreclosure, which could result in a total or partial loss of my investment.
- I understand that similar investment pools have suspended their share redemption program, and that the share redemption program offered by this investment, if any, may also be suspended, severely restricting the liquidity of my investment. I do not intend to use the share redemption program, if offered, and the suspension of a share redemption program will not adversely affect my liquidity needs. If an unexpected need for cash should arise, I have adequate means of providing for that need outside of this investment.
- I understand that just because the sponsor may anticipate a liquidity event by a certain date, it does not mean a liquidity event will occur. It could take longer than expected. I have reviewed the Prior Performance tables in the prospectus to learn about the sponsor's track record for inducing fund liquidations.
- I understand that there are additional risks associated with this investment, and have been urged by my financial advisor to read the prospectus.
- I have read and understand the RISK FACTORS portion of the offering document.

| _____ | _____ | 01/18/2012 |
|---|---|---|
| Client Signature | Joint Client Signature | Date |

**Oil & Gas**

Client Initials _____   Joint Client Initials _____

- I understand that Oil & Gas partnerships are speculative in nature, and that wells may not produce enough revenue to return their cost. I understand that the prices of oil and natural gas are volatile and uncertain. Prolonged periods of low prices will have adverse effects on the value of my investment.
- I have been given ample time to consult with my tax advisor regarding the appropriateness of this investment.
- I understand that partnerships report taxes differently than other products and that I will receive Form K-1 instead of a more traditional Form 1099. I may need to request an extension to file my tax return at the federal, state, and local level.
- I have been given ample time to consult with my tax professional regarding the appropriateness of this investment, including, but not limited to, my ability to take advantage of any passive losses from the partnership, the impact of any challenge by the IRS to the partnership's deductions, the impact of the AMT on my investment, and the impact of any tax law changes in this area.
- I understand that there are additional risks associated with this investment, and have been urged by my financial advisor to read the prospectus.
- I have read and understand the RISK FACTORS portion of the offering document.
- **For investors in General Partner units:** I understand that there is a possibility of having to contribute capital above and beyond my original investment. I feel that the benefits of the tax sheltering, which are not found with Limited Partner units, outweigh this added risk. I am in a high enough tax bracket to justify the risk, because I expect to materially benefit from the tax sheltering features only offered by General Partner units. As a General Partner I will have UNLIMITED LIABILITY for Partnership Obligations which may exceed my subscription amount.
- **For investors in Limited Partner units:** I understand that my investment will not contain the same level of tax sheltering benefits as General Partner units.

| _____ | _____ | _____ |
|---|---|---|
| Client Signature | Joint Client Signature | Date |

## Continued

---

### Equipment Leasing

Client Initials _____     Joint Client Initials _____

- I understand that the cash distributions I receive from this investment are expected to be comprised of both earnings and return of capital. As a result, I understand that the Net Asset Value of my investment is expected to diminish over time. I understand that the value of the underlying equipment will depreciate over time, and thus, the value of my investment, upon termination of the program, will likely be far less than my original investment. I understand that the current distribution yield, if any, is not necessarily indicative of the profitability of the fund
- I understand that any share redemption program, if offered, may be suspended at any time. I intend to hold this investment for the life of the program. The program's termination or liquidity event could be many years away, and I can tolerate the illiquid nature of this investment for the duration of the program.
- I understand that leverage, especially debt subject to balloon payments and floating rates, increases the likelihood of default, which could magnify losses within this investment program, decreasing the value of my investment.
- I understand that partnerships report taxes differently than other products and that I will receive Form K-1 instead of a more traditional Form 1099. I may need to request an extension to file my tax return at the federal, state, and local level.
- I understand that there are additional risks associated with this investment, and have been urged by my financial advisor to read the prospectus.
- I have read and understand the RISK FACTORS portion of the offering document.

_____     _____     _____
Client Signature                      Joint Client Signature                      Date

### Hedge Fund / Fund of Hedge Fund

Client Initials _____     Joint Client Initials _____

- I consider myself to be a sophisticated person and understand the nature of the investment. I can bear the economic risks of the investment, as well as the limitations on liquidity, if any. I feel the size of my investment is appropriate.
- I understand that hedge funds typically do not make periodic distributions of their net income or gains, if any, to investors. I understand that, whether or not distributions are made, I may be required each year to pay taxes on my portion of the funds taxable income, and will likely have to pay these taxes from other sources.
- I understand that because of the multiple levels of tax reporting involved with a fund of funds, I will likely need to request an extension to file my tax return at the federal, state and local level
- I understand that leverage within a portfolio may magnify losses.
- I understand that there are additional risks associated with this investment, and have been urged by my financial advisor to read the prospectus
- I have read and understand the RISK FACTORS portion of the offering document.

_____     _____     _____
Client Signature                      Joint Client Signature                      Date

### Managed Futures

Client Initials _____     Joint Client Initials _____

- I understand that futures and options trading can quickly lead to large losses, which can sharply reduce the Net Asset Value of my investment.
- I understand that substantial management, advisory, and brokerage fees will affect the funds ability to earn a profit.
- I understand that there are additional risks associated with this investment, and have been urged by my financial advisor to read the prospectus
- I have read and understand the RISK FACTORS portion of the offering document.

_____     _____     _____
Client Signature                      Joint Client Signature                      Date

**Continued**

**Business Development Company (BDC)**

Client Initials _____     Joint Client Initials _____

- I understand that the current distribution yield, if any, is not guaranteed, and that this is not a "fixed income" product. Dividends and distributions may be reduced, paid out in stock instead of cash, or even ceased altogether. I can withstand such event and I am not relying on the income stream, if any, to meet my cash needs for the foreseeable future.
- I understand that Business Development Companies invest in securities (both equity and debt) of private companies, as well as thinly traded securities of publicly registered companies. The quasi-private nature of the securities to be invested in present certain challenges, including the lack of available information about these companies.
- I understand that neither the fund nor its sponsor will control its portfolio companies. Due to the lack of liquidity for its investments in non-traded companies, the fund manager may not be able to dispose of interests in its portfolio companies as readily as they would like, or at an appropriate valuation.
- I understand that there is a risk that the fund could fail to qualify for pass through tax treatment because of the strict conditions that must be met in order to qualify as a Business Development Company. If the fund fails to qualify as a BDC, the amount available to me from distributions will be less than I would otherwise be entitled to.
- The share redemption program offered by this investment, if any, may be suspended. I do not intend to use the share redemption program, if offered, and the suspension of a share redemption program will not adversely affect my liquidity needs. If an unexpected need for cash should arise, I have adequate means of providing for that need outside of this investment.
- No more than 10% of my Liquid Net Worth can be invested in these types of programs.
- I understand that there are additional risks associated with this investment, and have been urged by my financial advisor to read the prospectus.
- I have read and understand the RISK FACTORS portion of the offering document.

_____     _____     _____
Client Signature                     Joint Client Signature              Date

---

**10.**  **Client Disclosure For Private Offerings ONLY, including those offered pursuant to Regulation D (investors in SEC registered, public offerings MUST NOT sign this part. Owner MUST initial, sign, and date product purchasing)**

Client Initials _____     Joint Client Initials _____

For Private Offerings ONLY, including those offered pursuant to Regulation D (investors in SEC registered, public offerings MUST NOT sign this part) I have read the prospectus, and understand the risks. I feel that this investment is suitable for me. I have relied on the information contained in the private placement memorandum, and only that information, in determining that this investment program is suitable for me based on my investment objective, liquidity needs, risk tolerance, time horizon, and tax status.

_____     _____     _____
Client Signature                     Joint Client Signature              Date

---

**11.**  **Financial Advisor Signature and Validation (REQUIRED)**
- I certify that the client meets the product suitability requirements.
- My customer(s) is/are well known to me, and I validate that the signature(s) on the attached document is/are genuine. I agree for myself and my successors, assigns, heirs, executors, and administrators to at all times indemnify and hold harmless LPL and all LPL staff and third-party providers, acting as authorized agents of LPL, from and against any and all claims, losses, liabilities, taxes, damages, actions, charges, and expenses, including attorney fees, resulting from your compliance with this request. LPL reserves the right to verify the authenticity of any signature.

BRANCH USE ONLY

| | | | |
|---|---|---|---|
| _Jeffrey N Williams_ (signature) | JEFFREY N. WILLIAMS | MN4C | 1/18/2012 |
| Financial Advisor Signature | Financial Advisor Name (print) | Rep ID | Date |
| _____ | _____ | _____ | _____ |
| Joint Financial Advisor Signature (optional) | Joint Financial Advisor Name (print) | Rep ID | Date |
| _Jeffrey N Williams_ (signature) | Jeffrey N Williams | MN4C | 01/18/2012 |
| Branch Manager Signature (required) | Branch Manager Name (print) | Rep ID | Date |

Exhibit 4

trader also compares the trades to a report received directly from the trust company, again checking that the client was given a price break if eligible.

The Compliance Surveillance group monitors compliance with LPL Financial UIT policies and procedures.

| Part VI | **Alternative Investments** | 14.41 |
|---|---|---|

**Introduction**   LPL Financial Advisors are permitted to assist clients with the purchase of only those alternative investment products that have been approved by LPL Financial. The term "alternative investment" includes limited partnerships, unlisted Real Estate Investment Trusts (REITS), limited liability companies, hedge funds, managed futures, business trusts and other illiquid pass-through investments. Advisors are prohibited from soliciting the purchase or sale of privately placed or distributed alternative investments without the express prior written approval of LPL Financial. All other transactions in alternative investments are private securities transactions that are expressly prohibited under FINRA Rule 3040 and may be grounds for termination for cause. In addition, an advisor is strictly prohibited from acting as a purchaser's representative in the sale of an alternative investment for which the advisor will be compensated by the issuer.

**Responsibility**   OSJ Manager & Designated Principal

**Resources**   IBPM Imaging Queue, Product Sponsor Application, LPL Financial forms

**Frequency**   Daily

**Action**   Review transactions for suitability

**LPL Financial Policy**   The Alternative Investment Operations department reviews all alternative investment paperwork to determine whether the transaction falls within LPL Financial guidelines. OSJ managers are required to approve all transactions for financial advisors they supervise by signing the appropriate forms. The Alternative Investment department will forward all OSJ manager transactions and exceptions to the Supervision group for principal review and approval. Supervision will route the transaction to the assigned Designated Principal for the OSJ manager.

The following charts below detail LPL Financial Alternative Investment policies and investment guidelines.

Clients under 70 years old

| Investment Objective | Liquid net worth up to $999,999 | Liquid net worth between $1.0M to $4.9M | Liquid net worth above $5.0M | Asset Categories (capped at 20%) |
|---|---|---|---|---|
| Income with Capital Preservation | 0% | 0% | 10% | Public Real Estate LP's, REIT's, Oil & Gas and Equipment Leasing |
| Income with Moderate Growth | 10% | 20% | 25% | |
| Growth with Income | 20% | 25% | 30% | |
| Growth | 20% | 25% | 30% | |
| Aggressive Growth | 25% | 30% | 35% | |

No more than 20% in any one asset category for clients with up to $10MM, those with $10MM or above may hold up to 25% in any one asset category.

Clients 70 years old and above

| Investment Objective | Liquid net worth up to $999,999 | Liquid net worth between $1.0M to $4.9M | Liquid net worth above $5.0M | Asset Categories (capped at 15%) |
|---|---|---|---|---|
| Income with Capital Preservation | 0% | 0% | 5% | Public Real Estate LP's, REIT's, Oil & Gas and Equipment Leasing |
| Income with Moderate Growth | 10% | 10% | 12% | |
| Growth with Income | 10% | 12% | 15% | |
| Growth | 10% | 12% | 15% | |
| Aggressive Growth | 10% | 15% | 15% | |

No more than 15% in any one asset category.

No more than 10% of client's LNW can be invested in programs treated as a business development company.

LPL Financial reserves the right to review any transaction, and will do so when appropriate, especially in cases where investors are of significantly advanced age (i.e., 65 and above).

Note: Prospectus requirements supersede these guidelines where applicable.

**Suitability and Required Disclosures**

Advisors are required to make a full and fair disclosure of all material facts pertaining to alternative investments they solicit or sell. This may include, among other things, disclosing that the alternative investment generally is illiquid and the customer may not be able to liquidate or sell the securities in the future. Advisors are also required to verify, at the time of purchase, that the customer meets all suitability requirements specifically provided in the prospectus or offering memorandum for such security (e.g., minimum annual income and net worth, state regulations, etc). As a reminder, LPL Financial considers liquid net worth to include all assets that can be liquidated within thirty (30) days, exclusive of real estate holdings. This includes, but is not limited to: checking and savings accounts, IRA and, all marketable securities, commodity accounts, cash, money market funds and precious metals. The liquid net worth reported on the new account form should include the assets being used to fund the LPL Financial account but should exclude any existing alternative investment holdings.

**Prospectus/Offering Memorandum Requirement**

LPL Financial procedures require that all advisors deliver to the client a copy of the prospectus or offering memorandum for any alternative investment product recommended or sold at the time of the recommendation or sale. LPL Financial advisors should familiarize themselves with the contents of the fund prospectus/offering memorandum prior to recommending a purchase to clients. LPL Financial advisors are required to order prospectuses for their clients from LPL Financial after completing the AI2 form. LPL Financial advisors may not hold prospectuses for approved private placements in their office. The prospectus or offering memorandum delivery is documented on the appropriate Alternative Investment Purchase form for the product being sold or solicited.

**Source of Funds**

The source of funds must be disclosed on each form. If it is determined that the source of funds is derived from a prospectus product, then the Request to Switch Investment (F27) form must be submitted with all other documents. Also required are the subscription documents, a check made payable to the investment sponsor or payment instructions, and all other forms required by LPL Financial (e.g., a new account form).

**Alternative Investment Approval Process**

All alternative investment purchases by customers must receive prior review by, and approval of, LPL Financial Alternative Investment Department. For each proposed alternative investment transaction, the financial advisor is required to deliver an alternative investment package

to the Alternative Investment Department. Alternative investment packages must contain the appropriate alternative investment form according to product.

**Alternative Investment Approval Process**

All alternative investment purchases by customers must receive prior review by, and approval of, LPL Financial Alternative Investment Department. For each proposed alternative investment transaction, the financial advisor is required to deliver an alternative investment package to the Alternative Investment Department. Alternative investment packages must contain the appropriate alternative investment form according to product.

**Alternative Investment Exceptions Requests**

All exception requests must be presented to Compliance in writing. The information provided to Compliance should include: Client financial information, beneficiaries, additional insurance policies, health of client, and a compelling reason why client should be allowed to exceed the policy limits. Each request is viewed on a case-by-case basis and may require additional documentation. All requests for OSJ managers are routed to the Designated Principal and all requests for financial advisors are routed to the Surveillance group for review.

To be considered for an exception, the following information must be provided in writing:
- Is the client an accredited investor as defined by SEC Regulation D?
- What is the current health of the client?
- How many beneficiaries does the client have?
- Does the client have any insurance policies (e.g. long term care, life, etc.)?
- What is the client's current tax bracket?
- What is the breakdown of the client's net worth?
- What is the compelling reason as to why the client needs to exceed our policy?

Advisors should include any other information that will assist the Compliance Department in the decision-making process.

**Please note: LPL Financial cannot make exceptions to prospectus suitability requirements or the regulatory imposed limit of 10% of net worth in public managed futures. It is also the advisor's responsibility to review the prospectus for state-specific requirements.**

**Designated Principal Exception Review Process for Alternative Investments and Account Types**

The following should be considered when reviewing for an exception on Trust accounts:
1. When reviewing a trust account it may be necessary to review the trust documents.
2. Irrevocable Trusts must use the trust's financial information only.
3. If the trust is established using a tax identification number, the percentage guideline based on the investment objective will be instituted.
4. If the trust was established using a social security number, then

Case 1:15-cv-00156-JD   Document 1-1   Filed 05/01/15   Page 42 of 44

the oldest client registered should be considered for the LPL Financial policy, based on the investment objective.
5. Assets from a trust established using a tax identification number cannot be commingled with assets of the trustee's personal assets.

The following should be considered when reviewing for an exception on UTMA/UGMA/Guardianship/Custodial accounts:
1. The financial information of the minor or ward should be used.
2. The percentage of the client's liquid net worth is based on the account owner's assets.

The following should be considered when reviewing for an exception on Profit Sharing Plans, 401K's, Corporate, and Non-Profit accounts:
1. Read through Corporate Charter documents (if applicable) or any other documents to determine if these types of investments can be held in the account.
2. Use the entity's financial information.
3. The percentage must be based on the accounts investment objective and financials.

The following should be considered when reviewing for an exception on Individual or IRA accounts:
1. In most cases it may be appropriate to use the spouse's information if the client lives in a community property state. However, if the client has a prenuptial agreement then they may not be able to.

The following should be considered when reviewing for an exception on Joint accounts:
2. LPL Financial will consider the oldest account holder listed on the account to determine age suitability.

**Designated Principal Approval/ Rejection IBPM Process**

Designated Principals must take the following steps to approve or reject an alternative investment transaction:
1. Log in to IBPM
2. Click View
3. Click Inbox
4. This will open the "Viewer" box.
5. From the "Viewer" box, click on right arrow button until you reach the OSJ signature page (usually page 3 of 4). Review packet for completeness and LPL Financial policy and place note on signature area listed "Branch Office Manager".
6. To create the note:
   a. Click top left tool labeled "annotate", then click on left tool labeled "T". Then click and drag open a rectangular box to enter text. Automatically a box will pop up to enter text.
   b. Type: "Reviewed by-XX & the date". Once you enter the text and click the box close, the note will appear in the space where you created the box.
   c. Close out "Viewer", and save changes made to the paperwork when prompted.
7. Go to "Forms" tab and click "Customer Requests Pull" on right

side of form. Also verify "Records Verification Box" is unchecked.

8. If the order should be rejected, note the transaction in the queue for the reason the order is being rejected and click "Rejected". This will send the order back to the Alternative Investment Operations department.

9. Click "Approved". This will send the order back to the Alternative Investment Operations department.

**Alternative Investment Liquidations and Redemptions**

LPL Financial does not permit advisors to assist directly in the sale of an alternative investment for an LPL Financial retirement account, unless the client is selling or redeeming back to the general partner or if they are accepting a tender offer. For all other accounts, the advisor may provide to clients that wish to liquidate an alternative investment the name and telephone number of the general partner of the alternative investment that offers to redeem units to the terms of a prospectus. Any customer who wishes to sell an alternative investment should be made fully aware that:

- Alternative investment units usually sell at a very deep discount to their initial purchase price;
- The customer is responsible for paying all fees charged by the market maker, issuer or general partner in relation to the transfer; and
- The transfer process may take longer than eight weeks to be completed.

Additionally advisors are prohibited from independently determining the value of limited partnership units. An advisor who is preparing a customer portfolio summary or statement that includes limited partnerships must make sure that: (1) the summary or statement lists the limited partnership units in a separate location from other securities, and (2) the price assigned to the limited partnership units is the duly verified and documented price bid made for the security by an independent secondary market maker. The Communications with the Public chapter of this manual further explains the required disclosures on portfolio summaries and statements. Advisors are strictly prohibited from valuing limited partnerships at cost basis or at a price determined by the general partner other than as provided by the prospectus.

LPL Financial does not process secondary market sales and advisors are not allowed in any way to help the client facilitate the sale through a secondary market maker or provide the client with names and phone numbers of any secondary market makers.

**Retention of Third-Party Investment or Money Managers**

LPL Financial requires that all third-party investment or money managers engaged by an advisor to provide services to his or her customers be approved in writing by LPL Financial prior to use. All advisors interested in utilizing the services of a third-party investment or money manager not currently on LPL Financial approved list should provide the Alternative Investment department with a written request for approval. This request must include the name, address and telephone number of the third-party advisor's office, as well as any other information about, or publications

issued by, such advisor.

Advisors have a responsibility to review the services of any third party
investment manager they retain to provide investment management
services on behalf of the advisors' customer accounts. Such oversight
responsibilities require the monitoring of all orders and investment
positions to assure that each customer account is being managed in a
manner consistent with the stated investment objectives and financial
condition of the customer.

### 1031 Exchange Transactions

14.42

Under Section 1031 of the IRS Code, real estate investors are able to
defer capital gains taxes on sold properties by investing sale proceeds
into a like-kind property of equal or greater value. This "exchange" of
properties provides a deferral of taxes for the client and is commonly
referred to as a 1031 Exchange.

FINRA Notice to Members 03-71 reminds Member Firms of their
obligation to establish sufficient internal controls that are "reasonably
designed to verify that sales of Non-Conventional Investments (NICs)
such as 1031 products, comply with all applicable FINRA and SEC
rules."[2] FINRA Notice to Member 05-18 reminds Member Firms that
when offering 1031 tax-deferred exchanges of real property for tenants-
in-common (TIC) are securities and Member Firms and their associated
persons must comply with FINRA rules, including suitability, due
diligence, commission splitting with unregistered individuals or firms,
supervision, and recordkeeping.

Private Placements such as 1031 Exchange products have restrictions on
solicitation and sales activity with regard to investor qualifications.
Generally, an LPL Financial advisor may not solicit any new clients for
which they wish to offer a 1031 exchange. Regulations require that
advisors know their client(s) prior to engaging in this type of a
transaction.

Private Placements such as 1031 Exchange products have restrictions on
general advertising, general solicitation, sales activity, and investor
qualifications. Generally, an LPL Financial advisor may not solicit any
clients for which they wish to offer a 1031 exchange *unless* the advisor
has a pre-existing relationship of at least six months with the client.
Regulations require that advisors comply with "Know Your Customer"
and suitability requirements prior to engaging in this type of a
transaction.

In making a suitability determination in connection with a
recommendation to a customer to purchase a Tennant In Common (TIC)
interest, the financial advisor must consider whether the fees and
expenses associated with TIC transactions outweigh the potential tax
benefits to the customer. TIC interests with high up-front fees and
expenses must be reviewed closely to verify it is suitable for the investor.
TIC transactions in some cases may not provide complete tax-free

---

[2]FINRA NTM 03-71