UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NEW HAMPSHIRE BUREAU OF SECURITIES REGULATION, | ) ) ) ) |
| Plaintiff, | ) ) Civil Action No. 15-cv-156-JD |
| v. | ) ) ECF Case |
| LPL FINANCIAL, LLC, | ) ) **Oral Argument Requested** |
| Defendant. | ) ) |

**MEMORANDUM IN SUPPORT OF
OBJECTION TO PLAINTIFF'S MOTION TO REMAND**

Plaintiff New Hampshire Bureau of Securities Regulation (the "BSR") has moved to remand its lawsuit against LPL Financial LLC ("LPL") to the state forum from which LPL removed it. LPL removed the action because diversity exists between LPL, a citizen of Massachusetts, and the BSR, a citizen of New Hampshire. The BSR maintains that diversity is lacking because it is not a citizen and, in the alternative, that this case does not meet the First Circuit test for removing administrative actions. The Court should deny the BSR's motion.

First, as LPL discusses in more detail below, removal was proper in this case because the BSR is sufficiently autonomous to be considered a "citizen" for purposes of diversity jurisdiction. The First Circuit has long recognized that a state entity can be considered a citizen for purposes of diversity jurisdiction if it is self-funded. Here, state budget documents and public statements by Secretary of State William Gardner and state legislators show that the BSR is self-funded. The BSR receives no General Fund appropriations from the state and has not for nearly two decades. Although the BSR tries to sidestep this issue through carefully phrased

arguments regarding the theoretical possibility that it could receive funding from the state, the BSR fails to point to a single appropriation from the General Fund since 1996. In fact, no such appropriation exists because the BSR is entirely self-funded through fines and fees. Furthermore, to the extent the Court is inclined to credit the BSR's claims that it is not sufficiently autonomous to be considered a citizen, LPL seeks leave to take limited jurisdictional discovery for the reasons LPL has set forth in an accompanying motion.

Second, the BSR's alternative argument – that this "adjudicatory proceeding" cannot be removed because it is a state administrative action – is also unavailing. This "adjudicatory proceeding" (as the BSR itself calls it) falls well within the category of state administrative cases the First Circuit (and other courts) have held to be removable, because it is both "court-like" and implicates a federal interest. More specifically, were this to proceed in the state forum, a presiding officer appointed by the Secretary would hold a hearing; at the hearing, the BSR and LPL would be represented by counsel and present evidence; following the hearing, the officer would decide by a preponderance whether LPL violated Financial Industry Regulatory Authority ("FINRA") rules; and the officer would then issue a decision, which could be appealed to the state Supreme Court. Such proceedings interpreting FINRA rules, especially as applied to a business like LPL that operates in every state, are removable under First Circuit law. In making its argument to the contrary, the BSR improperly cites to out-of-Circuit case law that is contrary to the controlling First Circuit precedent.

# I. BACKGROUND

### A. The BSR Has Sued LPL For, Among Other Things, Allegedly Violating FINRA Rules

On April 6, 2015, the BSR filed a Complaint against LPL with Secretary Gardner, and the Secretary issued an order the same day commencing an "adjudicatory proceeding" pursuant to N.H. RSA 421-B:26-a. Notice ¶¶ 1-2. The Complaint alleges that LPL financial advisors did not have a reasonable basis for believing that certain sales of non-traded real estate investment trusts to New Hampshire residents were suitable, *see* Compl. ¶ II.5 (citing N.H. RSA 421-B:3-a), and that LPL failed to adequately supervise certain sales, in violation of supervisory rules promulgated by FINRA, the national self-regulatory agency registered under the Maloney Act, a violation of which is a violation of New Hampshire law, *see* Compl. ¶¶ II.6-7 (citing FINRA Rules 3110(a), (b)(1) and N.H. RSA 421-B:8(X)). Under the BSR's view of the FINRA rules, LPL's system to supervise these sales and its implementation were inadequate. Compl. ¶¶ II.6-7.

### B. LPL Timely Removed The BSR Lawsuit To This Court Based On Diversity

On May 1, 2015, LPL timely removed the BSR lawsuit to this Court on the basis of diversity jurisdiction, as LPL is a Massachusetts citizen and the BSR is a New Hampshire citizen. Notice ¶¶ 14-18. In the Notice, LPL also explained why this matter is a properly removed "civil action in a State court" under the removal statute. ¶¶ 5-13.

# II. ARGUMENT

### A. The BSR Has Failed To Carry Its Burden To Challenge Removal And, In Any Event, LPL Has Shown By A Preponderance That Removal Is Proper

Although LPL, as the party invoking jurisdiction, bears the ultimate burden of proving jurisdiction by a preponderance of the evidence, the BSR also bears a burden here, one that it has not carried. *See Univ. of R.I. v. A.W. Chesterton Co.*, 2 F.3d 1200, 1213 (1st Cir. 1993)

("*URI*"); *see also Garcia Perez v. Santaella*, 364 F.3d 348, 351-52 (1st Cir. 2004). Specifically, once a removing party like LPL makes its *prima facie* case for jurisdiction in the notice of removal (as LPL clearly did by citing to, among other things, the BSR's budget and testimony by the Secretary regarding its funding), the burden shifts to the objecting party to "rebut this showing in order to dismiss the [removal petition.]" *See URI*, 2 F.3d at 1213 (internal quotation omitted). The BSR, however, has failed to rebut the *prima facie* case. Its citation to the "investor education" funding scheme and other unsupported arguments are insufficient, particularly since the BSR has failed to produce an affidavit in support of its factual assertions. The BSR's failure of proof should end the Court's inquiry into the citizenship question. In any event, as set forth below, credible and uncontroverted evidence shows that removal is proper.

**B.     The BSR Is Separate From The State And So Is A Citizen**

In order to determine whether diversity exists, this Court must answer a straightforward question: Is the BSR separate from the state? *See id.* at 1202 n.4 ("[T]he analysis must center on the State-related party's enduring legal identity as a juridical entity separate from the State."); *see also Metcalf & Eddy, Inc. v. P.R. Aqueduct & Sewer Auth.*, 991 F.2d 935, 940 (1st Cir. 1993) (Eleventh Amendment factors "have a common orientation: the more tightly the agency and the state are entangled, the more probable it becomes that the agency shares the state's … immunity."). To answer the question, factors borrowed from Eleventh Amendment cases, including relating to operational autonomy, may be instructive, but the bottom line is that this Court should find that the BSR is separate from the state if it is *fiscally* autonomous. *See URI*, 2 F.3d at 1202 n.4, 1210 n.15, 1210-17 (fiscal autonomy is most important consideration); *Univ.*

*Sys. of N.H. v. U.S. Gypsum Co.*, 756 F. Supp. 640, 644-45 (D.N.H. 1991) ("*UNH*") (same). The BSR is fiscally autonomous. Accordingly, it is sufficiently separate for diversity to exist.

### 1. The BSR Is Fiscally Autonomous And So Is Separate From The State

#### i. The BSR Receives No General Fund Money

The BSR takes great pains to state that it "depends on the legislature to fund its non-educational operations," Mot. at 8, and that it must "rely on the legislature's biannual appropriation to pay for the entirety of the bureau's non-educational operations," Mot. at 9. Conspicuously absent from the BSR's brief, however, is a single reference to any money actually appropriated from the General Fund to the BSR. While the BSR budget may be approved by the Legislature, that does not mean the Legislature appropriates General Fund money to the BSR. Indeed, no such appropriation has been made for nearly two decades. Exs. A-K to Affidavit of John Nichols, Esq.[1] As LPL noted in its Notice of Removal (¶ 17) and the BSR admits (Mot. at 8), the BSR's current-year expenditures are completely offset by "Agency Income." For FY 2014, "Agency Income" covered all of the $1,527,209 expended, consistent with the BSR's budgets for the past 18 years. Ex. J to Nichols Aff.

Secretary Gardner has openly acknowledged the fact that the BSR receives no General Fund allocations. Testifying before the State Senate in 1996, the Secretary highlighted that, as of that budget period, "not one dollar of General Fund money is being spent by [the BSR,] … [n]ot one dollar of General Fund money — because it is all being funding [*sic*] out of fines." Senate Committee Hearing on Bill No. HB1513 (April 17, 1996), at 11 (Ex. K to Nichols Aff.).

The BSR's attempt to dismiss this testimony as stale is unavailing: The general state of affairs described by the Secretary in 1996 persists through today, as the BSR continues to not

---

[1] In deciding the BSR's motion, this Court may consider materials beyond the Complaint and Notice of Removal. *See URI*, 2 F.3d at 1213.

5

receive General Fund allocations, as shown not only by the budget documents discussed above but, among other evidence, a January 2013 press report that quotes the Secretary at length.[2] In the article – published more than 16 years after the supposedly stale testimony – the Secretary was quoted explaining that, just like in 1996, the BSR receives no General Fund allocations:

> **'Everything is run through fines,' said Gardner**.... The way Gardner tells it, both [Gov. Steve Merrill and his legislative budget director] demanded [in the mid-1990s] that the Securities Bureau fund itself through fines as a way to reduce the general fund budget. 'No, no. I don't want to go through this route,' Gardner recalls himself saying. 'What if there are no fines to cover it?' But the two laid down the law (which the Legislature later passed), and it has all worked out, Gardner said, 'because we've had a pretty good track record'.… **If Securities doesn't bring in the settlements, 'the next year we don't have a bureau, unless the Legislature makes an allocation. Think about that,' Gardner said. Every year, Gardner said, the bureau has been able to raise $750,000 for its base budget for next year and then some.**

NHBR.com, "How the Securities Bureau's investor education fund paid for its LGC investigation," http://www.nhbr.com/January-25-2013/How-the-Securities-Bureaus-investor-education-fund-paid-for-its-LGC-investigation/ (Jan. 25, 2013) (emphasis added) (Ex. L to Nichols Aff.).

Because the BSR receives *no* General Fund appropriations but rather is entirely self-funded, it is by definition fiscally autonomous. *See URI*, 2 F.3d at 1210-11 (URI fiscally autonomous due to "substantial income from sources other than State appropriations," despite receipt of "part" of its funding from state); *UNH*, 756 F. Supp. at 644-47 (UNH fiscally autonomous due to self-funding 75% of operating expenses, despite receipt of the balance from state). As such, the BSR is separate from the state. *See URI*, 2 F.3d at 1210 n.15, 1210-17 ("[C]ourts generally agree on the primacy of the financial autonomy factor."); *UNH*, 756 F.

---

[2] The BSR's argument that, since the Secretary's testimony in 1996, the Legislature has required the BSR to remit some fees to the state misses the mark. That amendment in no way changes the fact that, then as now, the BSR received no General Fund allocations. Moreover, pointing to this amendment ignores the fact that the BSR, then as now, controlled a recurring "investor education" fund that it reportedly uses to fund not just investor education, but also its enforcement program. *See* Sec. II.B.1.ii, below.

Supp. at 644-47; *see also Metcalf*, 991 F.2d at 942 (agency separate for Eleventh Amendment purposes due to ability to self-fund because "[t]he power and opportunity to generate a revenue stream and thereby finance an agency's operations is an important attribute of the agency's separate identity").

The BSR's arguments to the contrary (Mot. at 6-9) are not only legally unsupported under *URI* and *UNH*, but contradict what Secretary Gardner and state legislators have themselves acknowledged is the obvious consequence of the BSR self-funding – the BSR is separate from the state. The same 2013 article noted above quotes the chair of the State Senate Commerce Committee as noting with respect to the BSR "how little oversight there is when an agency is living off the revenue that they collect":

> **[In 2012, the BSR] returned $1.2 million to the general fund…. As a result – and the fact that the Secretary of State reports to the Legislature and not the governor – the bureau has had relative autonomy, said Gardner**….
> Lawmakers familiar with the bureau arrangement don't seem troubled by it. **'We never looked at the details of where Securities gets its money or does with its money because it doesn't really affect the general fund,' said Rep. Susan Almy, … who chairs the House Ways and Means Committee.** 'It is one of the smaller revenue sources, and I don't believe we ever discussed it.'

Ex. L to Nichols Aff. (emphasis added). This level of oversight is similar to that found in *URI* and *UNH*. *URI*, 2 F.3d at 1211 ("[T]he State of Rhode Island engages in but limited monitoring of Board revenues and expenditures."); *UNH*, 756 F. Supp. at 646-47 ("[O]versight [of UNH] is more in the nature of review, study, and awareness of the activities and needs …, not control.")

> ii. **The BSR Controls A $725,000 Recurring "Investor Education" Fund, Which Is Separate From The General Fund, And Which It Uses To Pay Not Just For "Investor Education" But For Its Enforcement Actions**

That the BSR is fiscally autonomous is only reinforced by the "investor education" funding scheme. *See* Mot. at 7-8. This $725,000 recurring fund entirely supported by fines and

7

fees is separate from the General Fund and spent at the BSR's discretion. *See* N.H. RSA 421-B:26(II-c) (Investor education expenses shall be paid out of the investor education fund, which "shall be nonlapsing and continually appropriated."). It is accordingly, in and of itself, powerful evidence that the BSR is separate from the state. *See URI*, 2 F.3d at 1210-17; *UNH*, 756 F. Supp. at 644-47; *see also Metcalf*, 991 F.2d at 942. Regarding a 2012 bill that would have merged the "investor education" fund into the General Fund, the Department of State stated that "*the investor education fund is … the source of funding for the bureau of securities …* [and if] all the revenue from the investor education [*sic*] is deposited into the state general fund, there will need to be a corresponding general fund expenditure of approximately $1,200,000 to fund the bureau." SB 294-FN (2012 Session) (emphasis added) (Ex. M to Nichols Aff). Of course, no General Fund expenditure has been made because the BSR was and remains entirely self-funded.

Moreover, although the BSR downplays this fund as being used for only "investor education" (Mot. at 7), the BSR reportedly funds its enforcement actions using this money. According to the same 2013 article noted above, consistent with the impact statement discussed above, the BSR uses a provision allowing it to retain "administrative costs," N.H. RSA 421-B:26(IV), to collect payments from enforcement defendants, which it then rolls forward to fund future lawsuits. Ex. L to Nichols Aff.

### iii. Remitting Surplus Does Not Destroy The BSR's Fiscal Autonomy

The fact that RSA 421-B:26(IV) requires the BSR to remit to the state money in excess of $725,000 does not destroy the BSR's autonomy, and the BSR cites no authority stating otherwise. First, as noted above, the BSR does not, in fact, remit all money in excess of $725,000, but instead uses "administrative costs" funds to underwrite its enforcement program. Second, just as *receiving* payments from the state does not necessarily destroy an agency's

8

separate identity, *see URI*, 2 F.3d at 1210 (URI received "part" of its expenses from state); *UNH*, 756 F. Supp. at 646 (UNH received 25% of its expenses from state), *making* payments to the state does not necessarily destroy the BSR's separate identity. The inquiry remains whether the BSR is separate from the state, considering its fiscal autonomy, and it clearly is.

That the BSR cannot short-circuit this analysis by pointing to remittances is not only made clear by the reasoning in *URI* and *UNH*, but by decisions finding that state lottery commissions are separate for Eleventh Amendment purposes, even though those entities are expressly created to generate revenue for states. In one such case, a district court in this Circuit held that the Rhode Island lottery commission was separate, following a detailed analysis of its relationship with the state, even though the commission was required to remit 30% of its revenue directly to the state general fund. *ACLU v. R.I. Lottery Comm.*, 553 F. Supp. 752, 756-57, 764-65 (D.R.I. 1982). In another, the Sixth Circuit likewise performed a detailed analysis and held that the Indiana lottery commission was separate, even though that lottery – a "pure profit producer for the state" – was required to remit quarterly seven-figure dollar amounts to various state funds. *Burrus v. State Lottery Comm.*, 546 F.3d 417, 418-19, 421 (7th Cir. 2008).

In sum, because the BSR receives no General Fund allocations (and has not for nearly two decades) and funds its education and enforcement program from a recurring $725,000 non-General Fund pool, the Court should find the BSR is fiscally autonomous and, in turn, sufficiently separate, for diversity to exist.[3]

---

[3] Still further proof that the BSR is separate from the state is provided by the fact that the BSR in one case used a $5,000,000 settlement payment to endow a center to provide academic programming regarding corporate governance. Reportedly, then-BSR Director Mark Connolly sat on the center's board at founding. NHBR.com, "Questions raised about $7m Tyco settlement spending," http://www.nhbr.com/July-26-2013/Questions-raised-about-7m-Tyco-settlement-spending/ (July 26, 2013) (Ex. N to Nichols Aff.). According to the same article, Secretary Gardner sat on this board when it decided to fund programs at the University of New Hampshire and Saint Anselm at the direction of Secretary Gardner. *Id.*

## 2. The BSR Is Separate From The State, Regardless Of The Other *URI* Factors

The BSR's recital of the other non-exclusive factors from *URI* does not change the conclusion that the BSR is separate from the state based on its fiscal autonomy. *See URI*, 2 F.3d at 1210-11. As noted above, these factors borrowed from Eleventh Amendment cases may be of limited utility in a case such as this, particularly where the BSR is the plaintiff and there is no claim seeking damages against the state. *See id.* at 1202 n.4. Regardless, at least two of the eight factors – fiscal and operational autonomy – in fact support that the BSR is separate, *see* Sec. II.B.1, above. In the words of Secretary Gardner, "the bureau has had relative autonomy." *See* Ex. L to Nichols Aff. Other factors cited by the BSR (Mot. at 9) are of limited import or simply indeterminate – e.g., the BSR claims it lacks the authority to sue, but it is suing LPL in this very action; the BSR claims it lacks the authority to contract, but the Secretary of State in at least one instance contracted with a presiding officer to hear a BSR suit (Ex. O to Nichols Aff.); and the BSR correctly claims that it is not incorporated, but then notes that this factor is not determinative. The Court should resist the BSR's attempt to complicate the straightforward question here with these factors.[4] The question remains, Is the BSR separate from the state? The answer is: Yes.

## C. This "Adjudicatory Proceeding" May Be Removed Because It Is Court-Like And Implicates A Federal Interest

Although the BSR might suggest otherwise, the fact that the removed BSR proceeding is a state administrative action does not mean that it cannot be removed to federal court. Under well-settled First Circuit law, so long as the administrative proceeding is "court-like" and implicates a federal interest, removal is appropriate. *See Volkswagen de P.R., Inc. v. P.R. Labor*

---

[4] As noted above, and for the reasons more fully addressed in LPL's motion for leave, if the Court is inclined to credit the BSR's unsupported claim that it is not separate (and it should not), LPL respectfully requests that it first be permitted to take limited jurisdictional discovery.

*Relations Bd.*, 454 F.2d 38, 44-45 (1st Cir. 1972); *Nationwide Mut. Ins. v. N.H. Dep't. of Labor*, No. 07-cv-241, 2007 WL 2695387, at *6-7 (D.N.H. Sept. 12, 2007). Perhaps recognizing the problem that the First Circuit law poses to its remand motion, the BSR directs this Court to out-of-circuit case law that does not follow *Volkswagen*. *See* Mot. at 11. Yet it is the First Circuit's *Volkswagen* case and its progeny that control here. Under a straightforward application of the relevant First Circuit law, removal of this case is appropriate.[5]

### 1. The "Adjudicatory Proceeding" Before The Presiding Officer Compares Favorably To *Volkswagen* and *Nationwide* And So Is Likewise Court-Like

The BSR proceeding is court-like. Absent removal, this suit will be heard in an "adjudicatory proceeding" before a presiding officer appointed by the Secretary, where each of the BSR and LPL will present evidence through counsel. N.H. RSA 421-B:2(XVI-b), 26-a(I), (XII). Despite the BSR's suggestion that the BSR will both prosecute and decide the case (Mot. at 12-13) – a prospect that might raise serious due process concerns if true – the "adjudicatory proceeding" thus is clearly inter partes.[6] And the rules governing this proceeding reinforce that it otherwise is court-like under *Volkswagen*. Key procedures are set out in LPL's Notice of Removal (¶ 7) and include that the presiding officer will render decision following hearing, based on a preponderance of the evidence, and that the decision is subject to appeal to the state Supreme Court. N.H. RSA 421-B:26-a(XXI), (XXVI); N.H. RSA 541:6. Indeed, procedures applicable here were specifically identified in another case in this District to be court-like. *Nationwide*, 2007 WL 2695387, at *6-7 (administrative action before Department of Labor

---

[5] Indeed, although not cited by the BSR, the Fourth and Seventh Circuits apply a rule similar to this Circuit's. *Kolibash v. Comm. on Legal Ethics of W.V. Bar*, 872 F.2d 571 (4th Cir. 1989) (federal officer removal statute); *Floeter v. C.W. Transport, Inc.*, 597 F.2d 1100 (7th Cir. 1979) (general removal statute).

[6] The term "inter partes" simply means "between two or more parties," which this case is. *See* Black's Law Dictionary (9th ed. 2009).

removable under *Volkswagen*).⁷ Because the "adjudicatory proceeding" here is substantially similar to the proceedings in *Volkswagen* and *Nationwide*, this Court should likewise find that this "adjudicatory proceeding" is court-like.⁸

### 2. Interpretation Of FINRA Rules Implicates A Federal Interest Supporting Removal

Under *Volkswagen*, removal of a state court-like proceeding, such as the one here, is appropriate so long as there is a federal interest implicated by the case. 454 F.2d at 44-45 (examine "the respective state and federal interests in the subject matter and in the provision of a forum"). *Volkswagen* does not require, as the BSR argues (Mot. at 13 n.6, 13-14), that the rule of decision be purely federal. Although the *Nationwide* Court recognized the obvious point that a federal interest can be shown where federal law provides the rule of decision, *see* 2007 WL 2695387, at *6 n.2, a sufficient federal interest may exist for other reasons – as is the case here.

In particular, although this is not a case in which federal preemption exists, the BSR nevertheless alleges that LPL violated FINRA rules incorporated by reference in New Hampshire law. Compl. ¶¶ II.6-7 (citing FINRA Rules 3110(a), (b)(1) and N.H. RSA 421-B:8(X)). Those FINRA rules were proposed pursuant to the power delegated to FINRA under the Securities Exchange Act of 1934, published for review in the Federal Register and subject to review by the United States Securities and Exchange Commission before adoption. *See*

---

⁷ The BSR is simply wrong that *Nationwide* turned on the administrative body's refusal to stay proceedings after removal (Mot. at 13 n.6); rather, the decision reflects a careful evaluation of the court-like proceedings, following *Volkswagen*. *See Nationwide*, No. 07-cv-241, 2007 WL 2695387, at *6-7. Nor does the procedural posture of the *Nationwide* case, including the fact that a Magistrate Judge issued the Report and Recommendation (and the agency did not object to it), change the fact that the court engaged in a detailed analysis and that the same result should be reached here. *See* Mot. at 13 n.6.

⁸ The BSR's invocation of its regulatory mandate and power to revoke LPL's license, which the BSR argues is relief "not typically available in a judicial forum" (Mot. at 12-13), does not undercut the court-like nature of the "adjudicatory proceeding" at issue. Under *Volkswagen*, this Court is supposed to examine not the BSR's broader regulatory activities, but the nature of this proceeding. 454 F.2d at 44 ("[W]e wish to emphasize that we are not questioning the institutional status of the Board as to any of its other functions, jurisdictions, or procedures."). That proceeding has many of the hallmarks of one in court, as discussed above, and indeed the BSR will seek relief awarded by courts, including cash penalties. *See* Compl. ¶¶ I.29, I.32, III.5-8.

Maloney Act, 52 Stat. 1070 (June 25, 1938); Notice of Filing of a Proposed Rule Change To Adopt Rules Regarding Supervision, 78 Fed. Reg. 40792 (July 1, 2013); Order Granting Approval of a Proposed Rule Change To Adopt Rules Regarding Supervision, 78 Fed. Reg. 79542 (Dec. 23, 2013). Given this federal nexus, there is a corresponding federal interest in resolving a dispute under the rules, including in ensuring their uniform interpretation.

Although the BSR dismisses the need for a federal forum to ensure uniform interpretation (Mot. at 14-15), a court vested with exclusive jurisdiction over certain securities law disputes and accustomed to applying rules affecting nationwide conduct is best equipped to hear this matter. There is a need for uniform interpretation of FINRA rules, consistent with the well-recognized need for such uniformity in other areas of the securities laws. The need for uniformity – and the federal interest in promoting it – is particularly acute in the case of LPL because LPL is an out-of-state defendant with operations in every state, meaning that conflicting interpretations of the FINRA rules could create the risk of inconsistent regulatory demands and even judgments.[9]

As a counterbalance to the federal interest in uniformity, the BSR points to the state interest in "protecting its citizens by regulating securities dealers and otherwise enforcing state securities law" (Mot. at 12-13). But this interest carries little weight, as it is a baseline generic interest present in all BSR cases. Crediting this interest at this level of generality would, in effect, mean that no BSR suit would be removable. Such a bright-line rule would clearly be at odds with the command of *Volkswagen* to assess the removability of each administrative action individually. 454 F.2d at 44. In this action, there is a more compelling interest in providing a

---

[9] The fact that FINRA itself has announced a settlement with LPL that includes two paragraphs of allegations regarding non-traded real estate investment trusts (the findings of which LPL neither admitted nor denied) does not alleviate the need for uniformity here (*see* Mot. at 5, 15) because the settlement on its face does not address the unique interpretation of FINRA rules raised in the BSR's claims. Moreover, to the extent the settlement is at all relevant, it shows that there is indeed a federal interest in applying the FINRA supervision rules, since FINRA itself cites those rules in the settlement.

federal forum to an out-of-state defendant with national operations, who is alleged to have violated rules of national application adopted pursuant to delegated federal power. LPL is of course *not* claiming that all BSR suits against out-of-state defendants necessarily present a sufficient federal interest, but only that this case, based on the specific allegations by the BSR against LPL, does present such an interest.

Finally, at least two other cases allowing removal under *Volkswagen* provide substantial additional support for removal here. In one, the District of Rhode Island allowed removal of a franchise termination dispute, which it termed a "contractual dispute." *Subaru of New England v. Bald Hill Realty*, Nos. 99-444, 99-466, Order Denying Motion to Remand, Tr. at 27-30 (D.R.I. Jan. 4, 2000) (Ex. P to Nichols Aff.). In the other, a Pennsylvania court citing *Volkswagen* held that a similar franchise termination complaint was removable, noting the federal interest in providing a neutral forum for out-of-state defendants. *Corwin Jeep Sales & Serv., Inc. v. Am. Motors Sales Corp.*, 670 F. Supp. 591, 594-95, 595 n.3 (M.D. Pa. 1986). Tellingly, the most significant federal interest in each of these cases was the federal interest in providing a diverse party a neutral forum (an interest implicit in all diversity removal cases, including this one).[10] If such federal interests can suffice, then here – where the federal interest in the alleged violation of FINRA rules is far more robust – removal is fully supported under *Volkswagen*.

## III. CONCLUSION

For all of these reasons, this Court should find that diversity jurisdiction exists and this matter is otherwise properly removed. Accordingly, the Court should deny the BSR's motion to remand. In the alternative, prior to any remand order on diversity grounds, this Court should permit LPL jurisdictional discovery.

---

[10] Here, the need for a neutral forum is buttressed by the potential due process issue presented by the BSR's suggestion that it will both prosecute and decide this case if it is remanded. *See* Mot. at 12-13.

Dated: June 18, 2015

                                              LPL FINANCIAL LLC

                                              By its counsel,

                                              /s/ Steven M. Gordon
                                              Steven M. Gordon, NH Bar No. 964
                                              Dustin M. Lee, NH Bar No. 20891
                                              Shaheen & Gordon, P.A.
                                              107 Storrs Street, P.O. Box 2703
                                              Concord, NH 03302-2703
                                              Telephone: (603) 225-7262
                                              Fax: (603) 225-5112
                                              sgordon@shaheengordon.com
                                              dlee@shaheengordeon.com

<u>Of Counsel:</u>

Jack W. Pirozzolo, MA Bar No. 564879
      (admitted *pro hac vice*)
Sidley Austin LLP
60 State Street, 34th Floor
Boston, MA 02109
Telephone: (617) 233-0304
Fax: (617) 223-0301
jpirozzolo@sidley.com

John Nichols, ME Bar No. 5222, NY Bar No. 4759908
      (admitted *pro hac vice*)
Sidley Austin LLP
85 Exchange Street, Suite 300
Portland, ME 04101
Telephone: (207) 805-9033
Fax: (207) 780-8278
jnichols@sidley.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


DATED:  June 18, 2015                       /s/ Steven M. Gordon
                                                              Steven M. Gordon
                                                              NH Bar No. 964